## THE KENILWORTH.

### SPRECKLES *et al.* v. THE KENILWORTH.

### SHIP-OWNERS' AND MERCHANTS' TUG-BOAT CO. v. SAME.

### SACRAMENTO TRANSP. CO. v. SAME.

*(District Court, N. D. California.* February 12, 1890.)

SALVAGE—AWARD—EXTINGUISHMENT OF FIRE.

In the early morning, fire from a burning warehouse was communicated to a wooden vessel and a steel ship fastened to the wharf, and, on attempting to run the latter into the stream, the tide took it along-side the former, and the two became entangled by falling rigging. A steam-boat, built of inflammable material, and loaded with broom-corn, after spreading tarpaulins, and stationing a man with a hose on her deck, was attached to the steel ship, and drew both vessels into the stream, where they were separated by the tide, when the steel ship was drawn on the flats. The steam-boat did not assist in putting the fire out, which was done by tug-boats which arrived some hours afterwards from a distant point, but, by separating the vessels, prevented the fore part of the ship taking fire. The tugs M. and S. played on the after part of the ship, and, after the deck was cooled, down the hatches. The R. made fast to the forward part, where there was danger from floating wreckage, and, after extinguishing the fire on deck, attacked that in the between-decks; and her men incurred great danger in descending the hatches to extinguish fire in the cargo of wheat. The M. had 100 feet of hose, the S., 200, and the R., 1,200, and played 5 streams. One hundred thousand dollars' worth of property was saved. *Held*, that $14,500 should be awarded as salvage,—$4,500 to the steam-boat, $3,000 to the tugs M. and S., and $7,000 to the tug R.

In Admiralty. On libel for salvage.

*Walter C. Holmes*, for Sacramento Transp. Co.

*Edw. W. McGraw*, for Ship-Owners' & Merchants' Tug-Boat Co.

*Andros & Frank*, for Spreckles.

*Charles Page*, for the Kenilworth and cargo.

HOFFMAN, J. The salvors in these cases saved property to the value of $100,000, which would otherwise have been nearly, if not quite, a total loss. Early in the morning of August 26, 1889, a fire broke out in the Port Costa warehouse, which soon spread to the adjoining wharf, to which the wooden ship Hanowaur was made fast. Astern of her was the steel ship Kenilworth, also made fast to the wharf. Both of these vessels caught fire from the burning wharf and warehouse. The master of the Kenilworth endeavored to move his vessel into the stream, but the tide took her along-side and against the Hanowaur. The falling rigging and spars entangled the two vessels, and it was found impossible to sep-

arate the Kenilworth from the Hanowaur. At this time the steam-boat San Joaquin No. 4 was lying, with banked fires, at Grangers' wharf, about one mile further up the stream. About 4 o'clock A. M. her captain was informed of the fires at Port Costa. He immediately repaired to the spot, saw the situation of the vessels, and at once returned to his boat, got up steam, and came down in her to render what assistance he could. Lines were attached to the Kenilworth; and, after two or three attempts, rendered abortive by the parting of the lines, he succeeded in hauling out, with his own hawser, both vessels into the stream, where they were soon after separated by the force of the tide. He then towed the Kenilworth to the mud flats, where she was anchored. I consider the San Joaquin performed a very meritorious salvage. She was built, like the ordinary stern-wheelers that ply on our rivers, of very light and combustible materials, painted and saturated with oil. Her deck-load consisted of broom-corn, loosely packed in bales, and very inflammable. The captain did everything in his power to minimize the dangers he exposed himself to by spreading tarpaulins on his deck-load, and by stationing a man with a hose to extinguish any sparks or flakes of fire that might fall upon his vessel. Had fire been communicated to the boat in several places simultaneously, or which, from any cause, had obtained a headway beyond the power of his hose to control, her total destruction was inevitable. The loss to her owners would in that case have been at least $75,000, perhaps more.

But it is to be noted that the San Joaquin No. 4 did not extinguish, or assist in extinguishing, the fire. That service was performed by the tugs. But for their intervention, the Kenilworth must have been consumed, as the Hanowaur was, and the services of the steamer would have been barren of result. On the other hand, it must be borne in mind that the tugs did not arrive until some hours after the steamer had hauled the vessels into the stream. Had the latter remained fouled with each other, and in close proximity to the burning warehouse and wharf, the damage to the Kenilworth must have been greatly increased. The forward part of the ship, which was then intact, might have been reached by the conflagration; and it was this part of the vessel which furnished a basis for the operations of the Relief, which performed the most effective part in extinguishing the fire. On the arrival of the tugs their first service would, in all probability, have been to haul the vessels away from the burning warehouse, and to separate them from one another. But this service had already been performed by the steamer. Valuable time was thus saved, and the tugs were enabled to go to work effectively, and without delay. All the tugs displayed commendable alacrity in repairing, without delay or hesitation, and at their best speed, to the scene of the disaster, some 20 to 25 miles distant from this city. The Monarch was the first to arrive; the Relief some 15 or 20 minutes later; and, soon after, the Sea King. The Monarch at first directed her hose upon the after-part of the ship, from her own deck. Some little time elapsed before the decks or deck-beams of the ship were sufficiently cooled to permit her hose, or that of the Sea King, whose hose was led

across the Monarch, to be played down the lazarette hatch, and hatch No. 4. It is claimed on behalf these tugs that they extinguished the fire in both of those hatches. But of this there seems to be much doubt. The Relief made fast to the forward part of the ship, and, after extinguishing the fire on deck, attacked the fire in the between-decks, working from forward aft. I am of the opinion that the merit of extinguishing the fire substantially belongs to the Relief, although the Monarch and Sea King contributed to the result,—to what precise degree I am unable to determine. The Monarch was provided with 100 feet of hose; the Sea King, with 200; the Relief had 1,200 feet. The Monarch's hose was 1¼ inches in size. The Sea King had 100 feet of 1¼ hose, and 100 feet of 2-inch hose. The Relief could play five streams of 2½ inches, and one stream of 1¼ inches. The disparity between her means and appliances for the extinguishment of fire was thus very great. The Relief, it is true, may not have put on all her hose streams; but it is not denied that she played five streams until noon; and after that four streams. It is reasonable to suppose that she used the extraordinary means at her command with judgment, and as circumstances required. She perhaps incurred some little risk of fouling her propeller in the wreckage floating, and partially submerged, near the quarter of the ship to which she was made fast. She hired three extra men from the shore to reinforce her crew. That her crew incurred a greater risk than they probably supposed in descending into the hatches to extinguish the fire in the wheat, of which the cargo was composed, is, I think, evident. Several of them, including the mate of the Kenilworth, were brought up from the between-decks almost unconscious from suffocation. Capt. Freeman, late United States inspector of hulls for this district, when asked if he had had any experience in regard to burning wheat, replied that he had had none. A few weeks afterwards, he and a very respectable merchant of this city were instantly and fatally asphyxiated by the fumes of burning wheat in the hold of a vessel into which they had incautiously descended. Had this deplorable incident occurred before the salvage service in this case was rendered, it would justly have been considered to have enhanced the merit of the salvors, by the exhibition of gallantry in affronting a known and formidable danger. In considering the amount of salvage to be awarded, and its distribution, I am reminded of the observation of the great chief justice in *The Sybil,* 4 Wheat. 98:

"It is almost impossible that different minds, contemplating the same subject, should not form different conclusions as to the amount of salvage to be decreed, and the mode of distribution."

I have examined the numerous cases, to which I have been referred, where salvage has been decreed under circumstances analogous to those of the suits under consideration. It is impossible to extract from them any definite rule or guide. Tested by some of them, the salvage I shall award would be deemed excessive. According to others, it would be considered inadequate. The only analogous case which can be taken as authoritative is that of *The Connemara,* 108 U. S. 352, 2 Sup. Ct. Rep. 754. The district court had awarded as salvage $18,930 on an agreed

value of $236,637. This award the supreme court refused to disturb, on the ground that it was not so manifestly excessive as to justify its interference under the act of congress of February 16, 1875. The court observes, however, that it might have been better satisfied if the award had been less. In applying this decision to the cases at bar, the circumstances must be considered. A ship towed by a steam-tug down the Mississippi river was anchored, and the tug was lashed to her side. During the night a fire broke out on board the ship. It was discovered by a passenger. He gave the alarm to the tug, and the fire was, by the aid of a steam-pump and hose, extinguished by the crew and passengers of the tug in 20 minutes. It will be noted that in this case the tug was in the service and employ of the ship. Her salvage service was, in a certain sense, compulsory, and necessary to her own safety, unless, with means of extinguishing the fire in 20 minutes, she had cast off the lashings, and left the ship to her fate. She does not appear to have had any extraordinary means or appliances, specially adapted for the extinguishment of fires. The amount of property endangered was much larger than the amount saved in the case at bar. But the degree of peril was far less, as is conclusively shown by the fact that the fire was extinguished, by the use of a steam-pump and hose, in 20 minutes. In the case of *The Suliote*, 5 Fed. Rep. 104, Mr. Chief Justice BRADLEY observes:

"In making this award to the protector, we have had regard to the fact that the value of her aid in affording salvage service is greatly enhanced by her being fitted and furnished for performing this kind of work. Being always ready and at hand, and powerfully efficient for the accomplishment of her purpose, a fire happening to any vessel in the harbor is bereft of much of its terror, and the damage actually ensuing therefrom is in most cases, and probably was in this case, greatly lessened in extent."

The observations of Judge SPEER in the case of *The Gler*, 31 Fed. Rep. 426, are to the same effect:

"These tugs rigged in this way, for the purpose of extinguishing fire, are just as important for the shipping interests as the fire-engines are to the city. They contribute as much in saving losses to the people, and to insurance companies, as do the fire-engines; and it is a part of the policy of the law to encourage those in charge of them."

I shall award a total salvage of $14,500, to be distributed,—$4,500 to the San Joaquin No. 4; $3,000 to the Monarch and Sea King; $7,000 to the Relief.