### THE ELMBANK.

#### PRICE v. THE ELMBANK et al.

(District Court, N. D. California. June 11, 1894.)

#### No. 10,639.

SALVAGE—COMPENSATION—EXTINGUISHING FIRE BY MEANS OF CHEMICALS.

A cargo of sulphur having taken fire while being discharged, and the city fire department, assisted by three steam tugs, having thrown water into the vessel for several hours without apparent effect on the fire, a skilled chemist, who had had experience in extinguishing a fire in another vessel by use of chemicals, at the request of the insurers, and with the assent of the master, took charge of the vessel, and, by generating and introducing into the hold carbonic acid gas, in a few hours brought the fire under control, and finally extinguished it. He was engaged in this work almost continuously during three days and nights, and thereafter rendered valuable services in supervising the unloading of the sulphur, his total attendance on the vessel covering the greater part of 19 days. The fire involved great danger of explosion, and of injury to the vessel from the combination of burning sulphur with the steel plates and other iron work. The value of the vessel was $76,000; of the sulphur, $21,000. *Held*, that $10,000 was a reasonable salvage compensation.

This was a libel by Thomas Price against the ship Elmbank and her cargo for salvage services rendered in extinguishing a fire in the cargo of sulphur in the hold of vessel by the use of chemicals. Value of vessel, $76,000; of sulphur, $21,000; total, $97,000. Award, $10,000.

Walter G. Holmes and Howell A. Powell, for libelant.

Andros & Frank, for claimants.

MORROW, District Judge. This action is brought to recover for salvage services alleged to have been rendered in June, 1893, to the ship Elmbank and her cargo, consisting of about 2,000 tons of sulphur, by Thomas Price, a chemist, in extinguishing a fire which had started in the sulphur stowed in the hold of the vessel, and which had baffled the efforts of the fire department of this city, assisted by three steam tugs, to place it under control by the use of water. The salvage services claimed to have been rendered consisted of skillful labor and the scientific application of chemical compounds which, it is claimed, was the only practical and efficient method of arresting the fire and saving the vessel and cargo from total loss and destruc-

tion. The Elmbank is a British vessel constructed of iron, and of about 2,188 tons burden. She is 279 feet long; 41.9 feet beam; her depth of hold—that is, the cargo capacity—is 24.2 feet, comprising the lower hold, which has a depth of about 16 feet, and the between decks, of about 8 feet. She had a cargo consisting of about 2,000 tons of sulphur and 1,100 tons of coal. The coal was stowed in two sections,—one, of about 500 tons, was stowed in the forward part of the vessel, in front of what is known as the collision bulkhead, and the other section was stowed in the after part of the vessel,—while the sulphur, which comprised the principal part of the cargo, was stowed in the lower hold and between decks. The sulphur was contained in bags or mats, stowed in tiers from side to side of the vessel as high as the between decks, leaving a space of about seven or eight feet from the upper deck, except under the hatches, where the bags were piled up to the hatch, forming a sort of column. The discharging of the vessel had been going on for about a day and a half when the fire was discovered. All the coal had been taken out, and some 200 or 300 tons of sulphur had also been discharged from the between decks, out of hatch No. 2, and 10 or 12 tons of sulphur had been taken from the lower hold out of the same hatch. The vessel was lying at Union street wharf. The stevedore and his gang had ceased operations about noon of Saturday, June 10, 1893, to partake of their midday meal. The fire was discovered about 12:15, and the records of the city fire department show that the alarm was sounded at 12:17 p. m. The fire seems to have spread very rapidly, for, when the engines of the fire department arrived at the wharf, dense volumes of yellow smoke were issuing from the hatches and from such other avenues of escape as there were. Five engines answered the call,—Nos. 1, 2, 5, 9, and 12. The latter engine is the most powerful in the service of the department. The city's fire boat also attended, as well as tugs owned by private parties, equipped particularly for the purpose of rendering efficient service to shipping on fire. The officers of the fire department promptly proceeded to contend with the fire. They directed streams of water into the hold of the vessel through the hatches. An attempt was made to descend into the hold, but the firemen were driven back by the suffocating smoke. All the hatches were opened; hatch No. 1 only partially. It seems that the streams were introduced through three of the hatches. Altogether some eight or ten streams of water were flowing into the hold. The chief of the fire department concluded that the seat of the fire was in the neighborhood of the large hatch, designated as No. 3. Later developments proved that he was correct, although he may have been mistaken as to the exact locality of the most violent section of the combustion. Finding that, in spite of the large quantity of water that was being poured into the hold, the fire was gaining, two holes were cut by the fire department in the deck, for the purpose of getting more directly at the seat of the fire. This, it seems, was suggested some 20 minutes after the engines had arrived. As the decks were of steel, the work of cutting holes proved a laborious and slow under-

taking. The task occupied about three-fourths of an hour, and, after all, so far as discovering the center of the fire, seems to have been fruitless. One of these holes was cut between hatches Nos. 2 and 3, in the middle of the deck; the other, abaft the main or No. 3 hatch. Pipes were inserted in these apertures, and the fire department did all it could, with the appliances it had at command, to extinguish the fire, without avail. The fire was not even arrested, but appeared to be increasing.

The Firemen's Fund Insurance Company, it appears, holds the insurance on the cargo of sulphur. Mr. Dutton, the vice president and manager of this company, had been advised of the fire when the alarm was sounded. He arrived at the wharf, in company with another gentleman, Mr. Smith, between 1:30 and 2 o'clock in the afternoon, and found the fire department hard at work pouring in water, and then engaged, also, in cutting a hole in the deck just abaft of hatch No. 3. Upon ascertaining that the fire department had not made any progress in checking the fire, Mr. Dutton, after remaining for 10 or 15 minutes, determined to call upon Prof. Price for assistance. To use his own words:

"It did not seem to me that that was the most satisfactory [way] to extinguish a fire of that kind. My idea was that it would be far better than scuttling the ship to extinguish the fire with chemicals."

He recalled the fact that Prof. Price had officiated in a like capacity some years previously, and had succeeded in extinguishing a fire in a cargo of lime in the bark Whistler. Mr. Dutton repaired without further delay to the laboratory of Prof. Price. What passed between these two gentlemen is thus testified to: Mr. Price says:

"I was in my office, and Mr. Dutton, vice president of the Firemen's Fund Insurance Company, came there, and said that there was a ship lying off the wharf at Union street, having some 2,000 tons of sulphur on board, and it was on fire, and the fire department had been there since soon after the fire had been observed, something approximating three hours, and, instead of the fire being extinguished, it was gaining. They were also pumping water into her from three tugs,—the Fearless, the Governor Markham, and the Relief; still they did not seem to be doing any good. He said he wanted me to come down; that he remembered I had, several years ago, put out a fire on a vessel that came into this port in distress, being on fire. He thought if I came down there I would be of assistance to the ship. We both jumped into a carriage that he brought up with him. On the way down towards the wharf where the ship was lying we talked on several matters. About half way down, if I remember rightly, he asked me what I was going to charge for my services, if I had any to give. I told him I would not mention any price. I would charge for the work. I did not know. It was dangerous work. I did not know how long a time it would take me to put out the fire, and to what danger I might be exposed, but I would take my chance on salvage to get what I would be entitled to if I rendered any assistance of value, or nothing if I did not render any assistance."

It will be observed that the witness states that the conversation as to "salvage" took place on their way down to the fire. Mr. Dutton testifies as follows:

"I went in, in company with Mr. Smith. Saw the professor there, at work in his laboratory with his son. I said: 'Professor, there is a ship with a load of sulphur on fire down at the Union street wharf. The fire department are pouring water into her, and it does not seem to me that is the way to put it out. Is it not a better way to extinguish that with chemicals?' He said: 'Of

course it **is**. It is the only way to do it.' I said: 'Can you come down and take hold as you did in case of the Whistler, and put the fire out?' He said: 'Certainly I can.' I asked him to hurry up and put on his coat and come down; that I had a wagon outside that would take him down. I told him that I had suggested to them down there that I was going up after him, and would bring him down. He started getting his matters at which he was at work in shape so that he could leave them. While he was washing his hands in a basin in the corner of the room, in his shirt sleeves, I said: 'Professor, what are you going to charge us for this,—to put out the fire?' He laughed and said: 'I will charge you— I will charge you what you gentlemen call salvage,' I kind of hesitated at that. He laughed and said: 'Oh, well, there will be no trouble about our coming to an arrangement, Mr. Dutton.' I said: 'No, professor; I guess there will be no trouble about that. We will come to an arrangement easy enough.' He said: 'Yes; it will depend on the amount of work I have to do how much I will charge.' We then got in the wagon, the three of us, drove over past my office, and there I got out to tell them I was going down with Prof. Price to the fire, and Mr. Smith got out and left us."

Mr. Smith, the gentleman who accompanied Mr. Dutton into the laboratory of Prof. Price, states:

"In his office Mr. Dutton spoke to him about the fire, and told him the ship was on fire,—a ship loaded with sulphur. Told him the general condition, and asked him if he could put it out. He said: 'Yes, I can put it out;' and he said he would charge him salvage. He spoke it in that sort of a careless, offhand way. He was washing his hands at the time. Q. Was that remark made in reply to any question which Mr. Dutton asked him in respect to his services? A. No, sir; I don't think the question was asked. The Court: Q. How did Prof. Price come to make the remark that he would charge him salvage? A. He asked him if he could put the fire out. He said: 'Yes; I can put it out, and I will charge you salvage for it.' It was in an offhand sort of way; not in the nature of any contract, but a casual remark. If I remember right, Mr. Dutton asked him if he could go down. He said, 'Yes.' He immediately left his work, and went to a basin, and began to wash his hands to go, and while he was doing that, as I recollect, this remark was made."

The inconsistency between these witnesses is that Mr. Price says that the conversation as to what he would charge took place while on their way down to the fire, while Mr. Dutton states that it occurred at the former's laboratory, and that no other conversation on the subject passed between them. Mr. Dutton is certainly corroborated by Mr. Smith as to a conversation respecting the question of compensation having taken place at Prof. Price's laboratory, but this witness also confirms the statement of Price that he would charge salvage. In view of this fact, and of the further fact that Mr. Dutton admits himself that Mr. Price said he would charge salvage, the inconsistency is immaterial. It must be so treated, unless the court rejects the testimony of these three witnesses on this matter. The testimony, then, amounts to this: Prof. Price swears that he said that he would charge nothing if he did not succeed, and take what his services were worth if successful. Mr. Dutton states that the professor said he would charge salvage. Mr. Smith also says that the professor stated that he would charge salvage. The fact is therefore established, not only by Prof. Price's own statement, but by the testimony of Mr. Dutton and Mr. Smith, that the libelant stated that he would charge salvage. Mr. Dutton says the remark, "I will charge you— I will charge you what

you gentlemen call salvage," was followed by laughter; meaning to imply, I assume, that the statement was not uttered in a seri- ous mood, but simply by way of jest. Mr. Smith, while testify- ing that Prof. Price said two or three times that he would charge salvage, states that this was said in an offhand, careless way, al- though he was not paying particular attention. I am not con- vinced from the testimony offered that the statement of Prof. Price that he would charge salvage was uttered by way of jest, or that he did not seriously intend what he then stated. In view of the circumstances of the case, the occasion which called forth the state- ment about salvage, and other facts which will be referred to later on, I am compelled to hold that Prof. Price meant what the wit- nesses admit he did state.

Immediately upon the arrival of Prof. Price and Mr. Dutton at the fire, a consultation was held between the captain of the vessel, Prof. Price, Mr. Dutton, Mr. Metcalfe, who was one of Lloyds' surveyors, and others, as to what should be done. Prof. Price warned them that an explosion was imminent unless they prevented the access of large volumes of air which were entering the ship through the open hatches, and which, combining with the sulphur vapor or flowers of sulphur, promotes explosion. So much water had been poured into the vessel that she began to list. As matters were getting worse all the time, it was determined to put Prof. Price in full charge. This step was agreed to by the captain himself. The professor directed the fire department and the tugboats to stop their pumping and to withdraw their lines; he ordered the hatches and apertures and crevices to be tightly closed, so as to admit as little air as possible. He requested the fire department to send all the chemical engines they had. He caused about a dozen of empty barrels to be procured, and sent for a load of muriatic acid and marble dust. The latter materials were introduced into the barrels with water, and the barrels were connected with the holes in the deck, by means of pipes or tubes. The object of this operation was to generate carbonic acid gas, and to introduce this gas into the hold of the Elmbank, and thus neutralize and extinguish the sulphuric fumes and flames. Prof. Price testified that it is the only way of coping with sulphur on fire. The capacity of the eight barrels used in the operation was, for each 100 pounds of marble dust, 44 pounds of carbonic acid gas, and this quantity of gas, it is testified, would occupy a volume approximately of 350 cubic feet. Eight barrels, at the same rate, would make a total volume of 2,800 cubic feet. After the preliminary preparations of connecting the barrels by pipes with the hold of the vessel had been com- pleted, the barrels were charged as above stated. They were vio- lently agitated, so that the water and muriatic acid might the more quickly and thoroughly come in contact with the marble dust, and thus generate the gas, and this operation was continued at short intervals. These preparations to manufacture this gas and arrange and connect the barrels by pipes with the hold of the vessel took some time. Prof. Price, with Mr. Dutton, reached the scene of the fire about 3:15 o'clock. Prof. Price states that gas

was being transmitted into the hold about 5 or 5:30 o'clock. Although the fire alarm did not call for a chemical engine, Prof. Price insists that one was on the ground when he got there. But, however that may be, one chemical engine was insufficient to put out this fire, and, when the others arrived, they did not work very successfully, for want of material with which to generate gas. Four chemical engines were in use. They used, at first, bicarbonate of soda, but their supply of some 300 lbs., which was all that they had brought with them, was soon exhausted. They next tried soda ash, but this did not work. Prof. Price then procured some bicarbonate of soda from a wholesale store. This delayed the use of the chemical engines for some two hours. The barrels were recharged every three hours, and were agitated every half hour, so as to keep up a continual flow of gas into the hold. They were in operation all night. The carbonic acid gas from both the barrels and the chemical engines was transmitted through the holes in the deck cut by the fire department. The chemical engines worked until Sunday, about 2 o'clock, when they were sent away, with the exception of one, which was kept on hand for a while in case of an emergency. They all returned again on Monday night, when the fire broke out a second time. The combined effect of the gas generated in these barrels and by the chemical engines placed the fire under final control in the course of about 60 hours. Prof. Price remained on board the vessel all of Saturday night, and was up superintending and watching the fire until about 5 o'clock Sunday morning, when he took a rest of about an hour and a half, on board the tug Fearless, which was lying close by. He remained by the vessel until about 12 o'clock noon; then left, coming back between 5 and 6 o'clock; remained on board all night and all day Monday, until about 8 or 9 o'clock of that evening; then went up town, and returned about 9:30 or 10 o'clock of the same evening. About noon on Monday the tug Fearless began to pump out the water in the vessel, in accordance with Prof. Price's previous instructions to that effect, as he intended to go down into the hold on Tuesday to ascertain where the fire had really started, and to determine whether it was entirely extinguished. When he came back, about 9:30 or 10 o'clock of that evening, he found that the fire had broken out again. He attributed this to the fact that the pumping out of the water had been commenced too soon, thereby allowing large quantities of air to gain access to the hold, creating a draught, and thus starting the fire again, which was not then entirely extinguished. He directed the hatches to be tightly battened down, all openings to be kept closed, and to continue filling the vessel with carbonic acid gas. He again sent for the chemical engines, having made arrangements with Chief Sullivan that he could have them whenever it should prove necessary. By Tuesday morning the fire was again under control. The vessel was kept tightly closed, and carbonic acid gas was introduced without cessation until Thursday. On that day a diver went down to make a passage between hatches Nos. 2 and 3, so that the sulphur bags might the more easily be removed. The stevedores attempted to

go down on Thursday afternoon, but the gas was still too strong to permit of their doing so. Prof. Price then prepared an exhaust fan, to expel the carbonic gas. He worked all night Thursday. On Friday he explored with the divers the hold of the vessel. Then the fire was considered entirely out. The actual discharging of the vessel was resumed on Saturday, June 17th, a week after the fire had started. On Monday, June 19th, Prof. Price directed the tug Fearless to come back and pump out the water in the vessel. Thereafter he attended on board regularly, spending most of his time at the vessel, directing and superintending operations of unloading and pumping out the water. The cargo was fully discharged on Wednesday, June 28, 1893. He left the ship on June 29, 1893. His service, so far as time is concerned, covered a period of 19 or 20 days.

The question has been raised as to who first suggested the use of the chemical engines. Mr. Dutton says that he first mentioned the use of the chemical engines to Prof. Price after the latter had been placed in full charge of the fire, and when they were both returning to the vessel, having been to order some marble dust. This conversation he fixes at about three-quarters of an hour after Mr. Price had been to the vessel. The latter denies that Mr. Dutton mentioned to him the use of the chemical engines; and in this he is certainly corroborated by the circumstances related by Chief Sullivan and by a reporter, Frank Martin. But, assuming the fact to be otherwise, it does not appear to me to be very important. Price had been placed in full charge of the vessel, and was putting in operation his method of extinguishing the fire. Mr. Dutton does not claim to have understood the use of chemicals for this purpose, and the suggestion, if made, did not carry with it such a knowledge of the operation as to diminish the value of Prof. Price's services. The situation required the direction of a person possessed of the special knowledge and skill of a practical chemist, one who not only understood thoroughly the properties of the chemicals to be used in such an emergency, but also their speedy manipulation and competent supervision while imminent danger existed, and continual attention while any risk of the fire breaking out again remained. The very fact that the libelant had had a former similar experience made his services, by reason of that experience, the more valuable. It should not be forgotten, indeed it is a fact indicating the value and necessity of the services rendered, that five engines and three tugs poured in an immense volume of water for the period of two hours, more or less, and made no appreciable effect on the fire. The chief of the fire department admits that he was unable to arrest the fire, and several witnesses present confirm his statement.

The testimony indicates that the services of Prof. Price were rendered in the face of danger. He testifies as follows:

"All that was necessary to form an explosion there was that the flowers of sulphur—sulphur vapor—should be sufficiently mixed with the oxygen of the air to determine an explosion. As an illustration of that, I must refer to the well-known fact in which I had an experience, first, to the explosion in coal

mines, which is not the result of the explosion of gases alone, but from the explosion that results from the intimate mixture of the coal dust in a finely divided state with the oxygen of the air, and from the further well-known fact, on which I have myself experimented, that when flour is in a finely divided state, mixed with the air, it will produce an explosion, and has done so in some of the largest flour mills in the world. In this instance, the sulphur in a finely divided state of powder, mixed as it was with the air, and sulphur being such a substance, it ignites at a much lower temperature than any car-bonaceous compound, such as coal and flour, and is in immediate danger of explosion should such a condition arise. Q. Just state what are flowers of sulphur, and how they are produced? A. By melting sulphur, bringing it up to its boiling point, which is between 750° and 800°, depending upon its purity. Then it commences to boil. After it commences to boil, it gives off brownish-yellow vapor, which, if conducted into a large close space, will form a flour-like or dust material. Q. Sulphur dust is the finest possible particles? A. Practically, that is what it is. Scientifically, we call it either sublimated sulphur, which is the most correct term, or flowers of sulphur. Q. When you reached the vessel the first time, did you see any flowers of sulphur? A. Yes, sir. Q. Where? A. Flowers of sulphur had settled all around hatch No. 2, hatch No. 3, and the ventilator was just simply lined with an incrustation of fine sulphur."

Again, he was asked:

"Q. The conditions to bring about an explosion would be flowers of sul-phur, air, and light? A. Yes, they were all there. All the conditions for an explosion were there. Q. The flowers of sulphur mixed with the air which came in contact with the light,—fire? A. With the flame. Q. I will ask you now if those conditions existed there when you reached the vessel the first time? A. It was in such a condition that it was likely to have happened at any moment. Q. From the time you reached there until up to what time? A. Until I had all the battens, and the masthead, and all those places, closed, and for some time afterwards, until I had neutralized the air with a sufficient quantity of carbonic acid. Q. That covered a period of what time? A. About two hours. Q. During which an explosion was possible? A. Was very likely to occur at any moment. Q. Did those conditions exist subse-quent to that at any time? A. Yes, sir; at the time that the fire broke out again on Monday afternoon,—Monday evening, I should have said, about 10 o'clock. Q. After or before the Fearless had arrived to pump out the wa-ter? A. Yes, sir. Q. After or before? A. After they commenced pumping the water. Q. How long did those conditions last at that time? A. There was no danger there over an hour afterwards, when I got everything closed down to prevent the mixture of the air."

Being asked the question: "What would be the effect of an explo-sion under those circumstances,—just as those circumstances were there at the vessel,—if you know?" the witness said:

"I think the effect of an explosion would have been to damage and strain the vessel to a very considerable extent, blow out the hatches, and extend the flame to the flowers of sulphur—sulphur dust—that had already settled in all parts of the vessel, especially in those empty spaces; and there would have been great danger to my life, and great danger to the cargo in general. If an explosion had occurred, it would have been impossible to put out that fire without some extraordinary means."

The witness is corroborated by several expert chemists as to the indications of danger where sulphur has been so heated as to be changed into so-called flowers of sulphur. Koebig says that, under the conditions described, there was danger of explosion. That gen-tleman has been a chemist since 1874. The fact, also, that there was sulphide of iron, the combination of sulphur and iron heated together, would indicate that there must have been great heat in the hold. Reynolds, proprietor of the California Chemical Works

in the city of San Francisco, and who has been in the business 50 years, testifies as to the explosive quality of sulphur when in a pulverized state. John Hewston, Jr., also a chemist for the past 40 years, says that sulphur is highly combustible, and that flowers of sulphur are more so than solid sulphur; that air will help to generate an explosion. The presence of flowers of sulphur would indicate that the sulphur had been volatilized by heat, and condensed. He also states that the presence of sulphide of iron would indicate that the iron of the vessel had become heated to a certain state. This last fact should not be overlooked in determining the pending danger to the vessel itself. On this point Prof. Price testifies as follows:

"Q. What is sulphide of iron? A. A mixture of sulphur and iron in the proportion of 32 parts of sulphur to 28 parts of iron. Q. Did this fire produce any sulphide of iron on the vessel? A. Yes, sir. Q. How was it produced? A. It produced a considerable portion of it on the steel deck, and on the ribs of the side of the vessel, as well as on the nuts that connected with the bolts that connected the steel deck to the wooden deck. Q. I will ask you if there was any danger of any union of sulphur and iron, producing sulphide of iron? A. Yes, sir; that I considered one of the great dangers connected with the ship. Q. Explain that. A. For the reason that the dunnage wood, as well as the bars that were fixed against the side of the vessel, being in close contact with the iron and steel sides of the ship, the combustion—the burning of the wood—would heat the plates of steel to a temperature of about 1,800, which is a red heat. The moment the sulphur comes in contact with iron at a red heat, the union of the iron and sulphur takes place, evolving at that same time a large amount of latent heat, intensifying the heat to a temperature known as white heat, thus compelling the sulphur to combine with the iron, forming sulphide of iron, which would melt away and utterly destroy that portion of the ship."

There is some conflict in the testimony as to the extent and character of the injuries to the iron plating and ironwork of the vessel resulting from the fire. It is admitted that some of the plates of the upper deck were warped and otherwise damaged, but, irrespective of the extent of such injuries to the vessel itself, the danger of a combination of sulphur and iron was present, and this is, in my opinion, an element to be considered in determining the value of the services.

The origin of the fire is a matter of conjecture. The captain of the vessel attributed it to the fact that, in discharging the cargo from hatch No. 2, the workmen had perhaps dropped a lighted match, or sparks from a pipe might have fallen, into the hold. But he is probably mistaken, for it is certain that the fire originated in or near hatch No. 3, which was closed, and spread athwartships, fore and aft, and upwards to the hatches. The melted sulphur had spread out some 15 to 20 feet athwartships and 20 to 25 feet fore and aft. The fire had reached the upper deck in several places, and had warped the platings of the upper deck, as above stated. It had charred the between-deck planks, and run out close to the dunnage battens. Prof. Price states that the fire was either the work of an incendiary or of spontaneous combustion; the latter would seem to be the more probable.

It is objected that the salvage services rendered were not of a high order of merit because they were not voluntary; that because

Mr. Dutton called upon and requested Prof. Price to take charge
of the fire, and to render whatever assistance he could, the actual
services rendered were of an inferior grade.   The mere fact that
a salvor is solicited to render service does not alter the character
of the actual services rendered.   Indeed, in some cases the request
to render assistance would afford evidence of the necessity for such
services.   In this connection, the language of Judge Ware in The
Centurion, 1 Ware, 495, Fed. Cas. No. 2,554, is applicable.   He
says:

"But the salvors in this case were volunteers, and were bound by no obli-
gation to the Centurion.  In all such cases, where services are rendered in
saving property which is in danger of being lost on the high seas, or when
wrecked, or stranded on the shore, it is, in the sense of the maritime law, a
salvage service, and it is quite immaterial whether the salvors accidentally
fall in with the wreck and volunteer their services, or are called upon by the
owners, or persons interested in the wreck, to aid in saving it.  It is the
place where the property is situated, and the circumstances of exposure and
peril in which it is found that determine the question whether it is a case of
salvage or not."

In the case of The Emulous, 1 Sumn. 207, Fed. Cas. No. 4,480, the
often-quoted language of Judge Story as to contracts to perform
salvage services is as follows:

"The court has been asked upon this occasion to lay down some clear and
definite rule as to what shall be deemed salvage service, and what shall be
deemed a mere common contract for labor and services.  I take it to be very
clear that wherever the service has been rendered in saving property on the
sea, or wrecked on the coast of the sea, the service is, in the sense of the
maritime law, a salvage service.  If it has been rendered under circum-
stances which establish that the parties have voluntarily, and without any
controlling necessity on the side of the proprietors of the property saved or
their agents, entered into a contract for a fixed compensation, or upon the ordi-
nary terms of a compensation for labor and services quantum meruerunt, in
either case it does not alter the nature of the service as a salvage service, but
only fixes the rule by which the court is to be governed in awarding the com-
pensation.  It is still a salvage contract and a salvage compensation.  It is
true that contracts made for salvage services are not ordinarily held obliga-
tory by the court of admiralty upon the persons whose property is saved un-
less the court can clearly see that no advantage is taken of the parties' situ-
ation, and that the rate of compensation is just and reasonable.  The doc-
trine is founded upon principles of sound public policy, as well as upon just
views of moral obligation.  No system of jurisprudence purporting to be
founded upon moral or religious or even rational principles could tolerate for
a moment the doctrine that a salvor might avail himself of the calamities of
others to force upon them a contract, unjust, oppressive, and exorbitant;
that he might turn the price of safety into the price of ruin; that he might
turn an act demanded by Christian and public duty into a traffic of profit,
which would outrage human feelings and disgrace human justice."

In The A. D. Patchin, 1 Blatchf. 421, Fed Cas. No. 87, Judge
Conkling, referring to the opinion of Judge Story just cited, said:

"The just inference, therefore, appears to be that he considered all services
which, if rendered voluntarily, would be salvage services, as not the less so
because rendered in pursuance of an agreement for that purpose, and as en-
titling the salvor to the like remedies, whether rendered in the one form or
the other.  If the salvor, especially after the performance of the service,
should take a bond or receive a bill of exchange or a negotiable promissory
note in payment, it may be conceded that his remedy would be limited to a
personal action on the security so taken.  But there does not appear to be

any solid reason for denying to the salvor a lien on the property saved merely because the salvage service was performed at the request either of the master or the owner, and under a promise of remuneration, especially as a court of admiralty possesses an unquestionable power to shield the owners of property saved against extortionate exactions by reducing an exorbitant reward promised under the pressure of alarm or distress."

In The Queen of the Pacific, 21 Fed. 470, Judge Deady speaks in the same strain. He says:

"Another point is made by the claimant as bearing on the question of the amount of the salvage, and that is that the service of the salvors was not voluntary, but rendered in pursuance of a request or employment on the part of the claimant. The authority cited in this connection is the case of The Undaunted, Lush. 90, 92. But the ruling in this case is only to the effect that, when the services are rendered in pursuance of a request from a vessel in danger or distress, the party rendering them is entitled to recover salvage, according to the circumstances of the case, although such services prove to be of no benefit; while one who volunteers his services to a vessel under the same circumstances, if unsuccessful, is entitled to nothing. But in either case the law implies that the service is to be paid on the usual condition of the ultimate safety of the property in question (The Versailles, 1 Curt. 361, Fed. Cas. No. 16,924); and whether the fact of a request shall affect the amount of the compensation for a salvage service must therefore depend upon the degree of danger in which the vessel is placed. If she is in no danger of destruction or serious damage, but only some slight injury, she may be a reasonable security for a salvage service rendered her upon request, although it should prove of no benefit to her. In such a case, compensation not depending on success, the amount of salvage may very properly be diminished accordingly."

Applying this doctrine to the case at bar, the fact that Prof. Price was requested to take charge of the fire may be considered as an indication of the estimation in which his services were regarded. Mr. Dutton himself recommended Prof. Price very highly to the captain of the burning vessel, who was uncertain as to what was the right thing to do under the circumstances. Mr. Dutton testifies that he said to the captain of the vessel, Chief Sullivan, of the fire department, Capt. Metcalfe, who was one of Lloyds' surveyors, and others present:

"Now, gentlemen, I have brought Prof. Price here. He is the leading chemist of the coast, and he says that this is not the proper way to extinguish this fire, and that it can be easily extinguished by the use of chemicals; and I wish you would give him an opportunity to go to work and extinguish it."

And it seems that the fact that, a few years previous, Prof. Price had extinguished a fire on board of the bark Whistler, whose cargo of lime was on fire, and had done so by the use of carbonic acid gas, induced Mr. Dutton to seek Prof. Price's services in preference to those of other chemists. He very wisely concluded that Price's former experience would be serviceable in this case. That his services were much desired is very plain, and it is to be said, to his credit, that he responded to the call with alacrity, and did not attempt to bind Mr. Dutton, or, in fact, any one else, with promises of future compensation, or convert what might have proved to be a profitless undertaking, and certainly a dangerous one, into a certain reward.

As to the character of the services, the case at bar differs from most cases of salvage. The peculiar skill and ability of Prof. Price as a chemist is undoubtedly the prominent feature of this salvage service. His services were desired and were of value because of his well-known familiarity with and experience in his profession. He states that carbonic acid gas is the only efficient agent to extinguish burning sulphur. Certain it is that the fire department, with the use of some five engines and the assistance of three tugs, pouring in such a quantity of water as to cause the vessel to sink at one end, was not able, at the expiration of two full hours, to arrest the fire or to affect it to any appreciable degree. All the witnesses who testified on that point agree that the efforts of the fire department had not the slightest effect on the fire, at least so far as could be determined from the volume of smoke, the heat, and other indications. But, whatever may have been the reason, it was evident that water was not extinguishing this burning cargo of sulphur, nor did there seem any probability of its doing so. For at least three days and nights Prof. Price was almost continuously engaged in supervising the generation, and the introduction into the hold, of carbonic acid gas, keeping the vessel under close surveillance, watching the temperature, and attending to the fire in general. The work was certainly exacting, and required the exercise of care and skill, and the abandonment of all other employment. That there was, for a time, danger of explosion, and, therefore, the situation was one of some peril and hazardous to life, is established by the testimony of Prof. Price and by the statements of the expert witnesses. This testimony is borne out by that of F. G. Edwards, one of the fire commissioners, and who was present after the fire first broke out. He testifies that he became apprehensive of an explosion; that, although the fire department did good work, the situation became a dangerous one. Whether such danger was imminent is, of course, impossible to determine with certainty; but that there was danger is unquestionable. This danger is therefore an element in the case as presented to the court, and the success of Prof. Price in averting the threatened disaster is a matter for consideration in determining the value of his services. In the case of The Suliote, 5 Fed. 99, the fire was in cotton bales stowed in the ship. Three tugs assisted in putting out the fire, two of which pumped in water, while the third, the Protector, a powerful tug specially equipped to render service in the case of fire, pumped into the hold of the vessel, not only water, but also carbonic acid gas, which was regarded by the court as having been an effective agent in extinguishing the fire among the cotton bales. The award was made on a valuation of cargo, vessel, and freight, amounting in the aggregate to $247,806.35. The salvage awarded by the district court was 15 per cent. Mr. Justice Bradley, in the circuit court, reduced the award to 8 per cent., making the allowance $19,824.51. In the case of The Cyclone, 16 Fed. 486, an award of 15 per cent. on the vessel and of 25 per cent. on the cargo of naphtha was made, amounting in all to $2,863.25. The vessel had been appraised at $6,500, and the cargo of naphtha at $7,553. The service

lasted for some four hours, and was rendered by two tugs. The meritorious character of the service is noticed by the judge in the following language:

"There are two circumstances in the present case which are well-recognized grounds for enhancing salvage reward: First, the extremity of the danger of the Cyclone, and the necessity of immediate relief; and, second, the personal hazard which attended the service, owing to the inflammable and explosive character of the cargo in her hold, and its exposed condition, the hatches being all open."

In The Avoca, 39 Fed. 567, Judge Benedict awarded $5,000 on a vessel and cargo consisting of 10,000 barrels of oil. The vessel had caught fire from a wharf to which it was attached. The salving tug came up, towed it into the stream, which consumed about 20 minutes, and proceeded to extinguish the flames, which was accomplished in about an hour and three-quarters. The value of the bark was $35,000; the value of the cargo, $36,760. With regard to the service, the learned judge says:

"It is not to be doubted that the services rendered by the Alice E. Crew on this occasion were salvage services of an important character. Had it not been for the timely presence of the Alice E. Crew, the proofs render it certain that the bark and her cargo would have been wholly destroyed, as were other vessels, by the same fire. The services so rendered were promptly rendered to a vessel in great distress. They were voluntary, and they resulted in saving the vessel and her cargo from destruction. * * * The services, however, were of short duration, and involved no special skill or hazard to the salvors."

In Spreckles v. The Brussels, 38 Fed. 524, the salvage service was by a steam tug to a vessel on fire, which prevented the fire from spreading until a fire boat came up and extinguished the fire. Afterwards, the steam tug towed the vessel to the mud flats. It did not succeed in subduing the flames, but prevented them from extending to a quantity of mustard seed and oil constituting part of the cargo. The service lasted a few hours. The service rendered before the fire boat came up lasted about a half hour. The learned judge considered that the services of the tug in this respect were valuable; and, though he could not say that the tug certainly saved the ship from destruction, she contributed to it, very possibly, in an important degree. The value of the vessel in her damaged condition was stipulated to be $15,000; the agreed value of the cargo was $55,312.56,—total, $70,312.56. The court allowed the sum of $1,500. The case was appealed to the circuit court, where the award was increased to $2,500. In the case of The Kenilworth, 41 Fed. 523, a fire started in a warehouse, and was communicated to a wooden vessel and a steel ship fastened to the wharf alongside the warehouse. The steel ship was the Kenilworth, valued at $100,000. Three tugs and a river steamer rendered salvage services in separating the two burning vessels, and in extinguishing the fire on the Kenilworth. The court awarded the sum of $14,500 to the salvors for the services rendered the Kenilworth. In the case of The Connemara, 108 U. S. 352, 2 Sup. Ct. 754, a vessel on a voyage from New Orleans to Liverpool, England, with a cargo consisting chiefly of pressed cotton, had been

towed down the river by a towboat and was anchored near the mouth of the Mississippi river. In the night, a passenger on board the ship was awakened by the smoke of burning cotton. He gave the alarm to the officers and crew of the ship and of the towboat. The fire was in the poop, above the main deck, and near the door, which could be opened by raising the latch; and the fire, when discovered, was confined to three bales of cotton, a spare sail, and two coils of tarred rope. There were 127 bales of cotton stowed in the poop. The towboat had on her deck a pump worked by steam, and hose long enough to reach the fire on the ship. As soon as the alarm was given, and by the exertions of the towboat's officers and crew, and of her three passengers, the hose was laid from the pump to the deck of the ship, and by their use of this pump and hose the fire was put out in 15 or 20 minutes without any damage to ship or cargo beyond the burning of the sail and the two coils of rope, the partial burning of the three bales of cotton, and the charring of a part of the upper deck or roof of the poop. In extinguishing the fire there was no serious risk of loss or damage to the towboat or of injury to life or limb of any of the salvors. No efficient effort was made by the officers or the crew of the ship to extinguish the fire. The ship had on her deck, within 15 feet of the fire, two tanks of water, holding 400 gallons each, one of which was full and other half full, with 6 buckets near the fire and 7 above, and a pump by which water could have been pumped upon the upper deck. At the time of the fire a steam tug was lying about a quarter of a mile off, and there was a telegraph station on a plantation near by from which a dispatch could have been sent to the city of New Orleans for aid to put out the fire, and efficient aid might have reached the ship from the city in two hours and a half after notice. The value of the ship and cargo was $236,637. The district court awarded as salvage the sum of $18,930.96, or 8 per cent. of the value. On appeal to the circuit court the award was reduced to $14,198, or 6 per cent. on the value. The case was appealed to the supreme court, where the judgment of the circuit court was affirmed. The court, in commenting on this award, said:

"In the present case, a vessel and cargo of great value were rescued from imminent danger by the energetic efforts of the salvors, and the amount of salvage awarded is less than one-sixteenth of the value of the property saved. Although upon the circumstances of the case, so far as they can be brought before us by the summary of them in the findings of facts by the circuit court, we might have been better satisfied with an award of a smaller proportion, we cannot say that the amount awarded is so excessive as to violate any rule of law."

While these cases are somewhat analogous to the one at bar, they do not furnish any very definite standard to which the court can resort to determine the amount of compensation for salvage services in the present case. It is an admitted state of the law of salvage that judges may arrive at different conclusions upon substantially similar facts. As was said by Chief Justice Marshall in The Sibyl, 4 Wheat. 98:

"It is almost impossible that different minds, contemplating the same subject, should not form different conclusions as to the amount of salvage to be decreed, and the mode of distribution."

But, so far as it is possible to deduce any rule or guide from these precedents as to the amount of compensation for salvage services, they should be considered and followed. Further than this, the particular facts of each case must govern. In the case at bar, the salved property was valued by agreement at $97,000. The services were of a peculiarly meritorious character. They did not consist in the use of the ordinary mechanical power, such as pumping in water, but they required and called into play the special skill and ability of Prof. Price as a chemist in the use of materials and appliances in extinguishing the fire. This is the important feature of the salvage service rendered by the libelant. It is not the only feature, but it is the important one. Furthermore, his efforts and system of extinguishing the fire were attended with success in saving both ship and cargo. The situation was a critical and dangerous one, which required prompt, intelligent, and effective measures to check the further progress of the fire and place it under control as speedily as possible. The only other way of putting out the fire that was considered feasible had signally failed, whereas Prof. Price's method checked its progress in a few hours, and placed it under absolute control in about 60 hours. While his attendance upon the vessel covered the greater part of 19 days, yet the period when the important salvage services proper were rendered may be said to cover a period of about 3 days. After that time it was considered more judicious and cautious by Prof. Price to closely watch the vessel, and supervise the unloading of the sulphur. While this part of the service cannot be regarded as salvage service, properly speaking, because, the danger of fire being past, there was no special need of his services in the capacity of salvor, yet, as he had been placed in full control by the captain of the vessel himself, until such supervision was revoked he was attending to duties pertaining to the safety of the vessel. Now, while this fact may not be considered as materially enhancing the salvage award, it is mentioned to indicate that the court is not unduly influenced by the mere length of time spent by the salvor in and about the vessel in superintending the discharge of the cargo after the actual period of danger had passed. But it may be observed, however, that his services in that connection seem to have been performed in a very satisfactory manner, and involved the suggestion that brought into operation the exhaust fan, by which the hold was cleared of the carbonic acid gas, rendering immediate work of unloading possible, and free from danger of suffocation. In view of all the circumstances mentioned, I am of the opinion that the sum of $10,000 is a fair and reasonable salvage compensation in this case, and a decree will accordingly be entered in favor of the libelant for that amount.