THE ELMBANK.

PRICE v. THE ELMBANK.

In re COFRAN et al.

(District Court, N. D. California. March 4, 1896.)

No. 10,639.

1. EQUITABLE ASSIGNMENT OF FUND—ORDERS TO PAY.
   An assignment of "all my right, title, and interest in and to any compensation" for certain salvage services, and directing the owners or consignees of the property saved, or any other person into whose hands the fund may come, to pay the assignee $3,200, is, notwithstanding the general words of the assignment, merely an order to pay a specified sum, and is therefore merely an equitable assignment of a part, as distinguished from a legal assignment of the whole, fund.

2. SAME—PARTIAL ASSIGNMENT OF CHOSE IN ACTION.
   An order to pay to a third party a specified amount out of whatever may be realized for salvage services is enforceable in admiralty, as an equitable assignment of part of a fund, and is not subject to the rule at law which forbids the splitting up of causes of action.

3. SAME—BONA FIDE PURCHASERS.
   One taking an equitable assignment of part of a fund or chose in action, as security for a pre-existing debt alone, is not a bona fide purchaser for

value, and cannot acquire priority over a previous assignment of the same character, by first giving notice of the assignment to the person holding the fund.

These were petitions by J. W. G. Cofran and Rudolph Neumann, to procure payment of certain sums claimed by them, respectively, out of money decreed to Thomas Price as salvage, in the suit of said Price against the bark Elmbank. See 62 Fed. 306, and 16 C. C. A. 164, 69 Fed. 104.

Van Ness & Redman, for petitioner Cofran.

Chickering, Thomas & Gregory and Gerstle & Sloss, for petitioner Neumann.

MORROW, District Judge. A decree was entered in this court on July 18, 1895, in favor of the libelant, in accordance with the mandate of the circuit court of appeals, for the sum of $6,000, less the costs of the appeal. The sum awarded was for certain salvage services rendered by the libelant in putting out a fire in the cargo of sulphur stowed in the hold of the bark Elmbank, while the vessel was being discharged at a wharf in the port of San Francisco. See 62 Fed. 306, for opinion of district court, and 16 C. C. A. 164, 69 Fed. 104, for opinion of the circuit court of appeals. Upon the entry of the decree, the claimants of the ship and cargo, instead of paying the amount of the award to the libelant, and securing a satisfaction of the decree, deposited the sum in the registry of the court, and obtained a full satisfaction of record, and the entry of an order that the several bonds given by the claimants for the release of the vessel and cargo be exonerated. This course appears to have been taken by the claimants in view of certain assignments executed by the libelant before the adjudication of the award, whereby the latter made such transfers to his creditors of his claim against the vessel that the aggregate of these claims is in excess of the sum now remaining in the registry of the court. The claimants, having been released from all liability in the case, are not concerned in the disposition of the award, and the same may be said of the libelant, who has failed to present any petition, or make any application for any part of the proceeds of the decree in his favor. Two petitions have, however, been presented to the court for the balance in the registry, based upon orders or assignments executed by the libelant. One of these assignments is in favor of J. W. G. Cofran for $1,585.42, and the other is in favor of Rudolph Neumann for $3,200. The amount in the registry of the court is $3,054.75, and the court is asked to determine the priority of these assignments, and distribute the sum accordingly. This may be done under the forty-third admiralty rule. Schuchardt v. Babbidge, 19 How. 239; The Lottawanna, 21 Wall. 558; The Guiding Star, 18 Fed. 263; The E. V. Mundy, 22 Fed. 173. The petition of Cofran was filed on July 23, 1895, and that of Neumann on July 25, 1895. Cofran's claim is based on an order to pay the sum of $1,585.42, signed by Price, and

drawn upon "M. J. Brandenstein & Co., and Whom Concerned." It is as follows:

"Thomas Price & Sons.

"San Francisco, June 28, 1893.

"Ship Elmbank, M. J. Brandenstein & Co., and Whom Concerned: Pay to the order of J. W. G. Cofran the sum of $1,585.42 from any money or moneys which may be awarded to me, or which I may recover from the ship Elmbank $\frac{and}{or}$ cargo service by reason of recent fire aboard said ship.

"[Signed]                                        Thomas Price."

The instrument under which Neumann claims is as follows:

"San Francisco, June 28th, 1893.

"For value received I hereby assign, transfer, and set over unto Rudolph Neumann, of San Francisco, California, all my right, title, and interest in and to any compensation for services performed by me upon the bark Elmbank in the matter of rescuing said vessel from destruction by fire; and I hereby direct Messrs. M. J. Brandenstein & Co., Mr. C. V. S. Gibbs, adjuster, the owner or owners, consignee or consignees, of said ship, or any other person or persons in whose hands the money for my services shall come, to pay the sum of $3,200 out of the same to the said Rudolph Neumann, his agent, or attorneys.                                        Thomas Price."

"Received a copy of within document this 28th day of June, 1893.

"M. J. Brandenstein & Co."

The matter was referred to the commissioner to ascertain the facts and make his report thereon. He finds that both of these assignments were made by Price on the same day, viz. June 28, 1893; that the one to Cofran was made at 8:30 o'clock in the morning, and the one to Neumann at 11 or 12 o'clock of the same day. He recommends, therefore, that the Cofran assignment, being the first in point of time, be paid in full, with his costs, and the remainder be paid to Neumann. Exceptions are presented to this report, by counsel for Neumann on several grounds. In support of these exceptions, it is claimed: (1) That the assignment to Neumann was a legal assignment of an entire fund, while that to Cofran was only an equitable assignment of a part, without the consent of the debtor, and that therefore Neumann's assignment is superior and entitled to priority; (2) that the assignment to Cofran was for part of the fund only, and therefore void, because the debtor was not notified, and did not accept the assignment; (3) that Neumann's assignment and claim are superior to Cofran's, because he first notified the United States marshal and clerk of this court.

It may be noticed, preliminarily, that, in referring to the instruments under which the petitioners claim, counsel speak of them as "assignments." Properly speaking, they are "orders to pay." But an order to pay, when given by a creditor upon his debtor, acts as an equitable assignment of the fund or of the personal property upon which it is drawn. 17 Am. & Eng. Enc. Law, p. 226; and cases there cited.

It becomes important, at the outset, to determine the legal effect of Neumann's assignment,—whether it was to the whole of the fund, or only a part of it. While it purports to be, in the first part of the instrument, an assignment of the whole fund, yet,

in the last part, it is limited to a specified sum, viz. $3,200, and it directs "Messrs. M. J. Brandenstein & Co., Mr. C. V. S. Gibbs, adjuster, the owner or owners, consignor or consignees of said ship, or any other person or persons in whose hands the money for my services shall come, to pay the sum of $3,200 out of the same to the said Rudolph Neumann, his agent, or attorneys." It is a well-settled maxim of equity jurisprudence that equity will look through and behind the mere form of a transaction, and scrutinize the substance. Applying this rule of interpretation to the assignment to Neumann, looking through the mere legal form of the words employed, and taking the instrument as a whole, it is difficult to escape the conclusion that it was intended as an assignment pro tanto; that is, to the extent of $3,200. Otherwise, why specify any sum? The amount of the award which libelant might be adjudged entitled to was then undecided and unliquidated; and if it was intended that Neumann should get the whole award, why interpolate this limitation as to amount? The language of the sixth subdivision of Neumann's petition confirms this view. It is as follows:

"That on the 28th day of June, 1893, Thomas Price, the libelant herein, by an instrument in writing sold, assigned, and set over to this petitioner all his right, title, and interest in his said claim for salvage against the said bark Elmbank and her cargo, and also in the judgment and decree rendered therein, to the amount and sum of thirty-two hundred dollars."

I am of the opinion that the general words in the assignment were inserted as a matter of precaution, and to give priority to this assignment, to the extent of $3,200, over any others that there might be. The designation of persons who are directed to pay this amount, includes every one who, in the regular course of proceedings, could obtain possession of the fund, and they are directed to pay the sum of $3,200, and not the whole award. Both assignments were, therefore, orders to pay specified sums of money out of the salvage award when it should be determined, and both were given, so far as appears, for pre-existing debts. In other words, they were given as security for debts previously due by Price to Cofran and Neumann. It may be observed that there does not appear to be any direct proof that the consideration for Neumann's assignment was a pre-existing debt, but that such was the fact seems to be conceded by counsel for Neumann. This view of the nature of Neumann's assignment practically disposes of the first proposition contended for by his counsel, except as it relates to the validity of an assignment of part of a fund not yet in existence, without notifying and obtaining the assent of the holder of the fund, which is precisely the same question presented in the second proposition and will now be considered.

To fully understand this contention, the facts and the nature of this proceeding must first be clearly comprehended. This is not an action at law, but it is a proceeding of an equitable nature to distribute a fund in the registry of the court. The proceeding is in the nature of interpleader. The case of Mandeville v. Welch, 5

Wheat. 277, and other cases following the doctrine laid down in that case, cited by counsel for Neumann, to the effect that there can be no assignment of a part of a fund or debt without the consent of the debtor, were actions at law. The rule at law is undoubtedly correct, as it is laid down in Mandeville v. Welch in the following language:

"Where the order is drawn, either on a general or a particular fund, for a part only, it does not amount to an assignment of that part, or give a lien as against the drawee, unless he consent to the appropriation by an acceptance of the draft; or an obligation to accept may be fairly implied from the custom of trade or the course of business between the parties, as a part of their contract. The reason of this principle is plain. A creditor shall not be permitted to split up a single cause of action into many actions without the assent of his debtor, since it may subject him to many embarrassments and responsibilities not contemplated in his original contract. He has a right to stand upon the singleness of his original contract, and to decline any legal or equitable assignments by which it may be broken into fragments. When he undertakes to pay an integral sum to his creditor, it is no part of his contract that he shall be obliged to pay in fractions to any other persons."

But the rule of law against "splitting up causes of action" has, obviously, no application to an equitable proceeding of this character. As is well said in the case of Superintendent v. Heath, 15 N. J. Eq. 22:

"The rule that, at law, assignment of part of a claim cannot be enforced, has no application in an equitable proceeding for the apportionment of a fund."

In Bank v. McLoon, 73 Me. 498, this language is used:

"In a court of equity, the objections to a partial assignment of a demand, which are formidable in a court of law, disappear. In equity, the interests of all parties can be determined in a single suit. The debtor can bring the entire fund into court, and run no risks as to its proper distribution. If he be in no fault, no costs need be imposed upon him, or they may be awarded in his favor. * * * We think, upon reason and principle, partial assignments should be sustained in a court of chancery, in all cases where it can be done without detriment to the debtor or stakeholder, whenever equitable and just results may be accomplished by it."

See, to same effect, Canty v. Latterner, 31 Minn. 239, 17 N. W. 385.

In equity, the assignment of a part of a debt or fund is good, and will be enforced. Grain v Aldrich, 38 Cal. 514; O'Dougherty v. Paper Co., 81 N. Y. 496, 500; Risley v. Bank, 83 N. Y. 318; Daniels v. Meinhard, 53 Ga. 359; Etheridge v. Vernoy, 74 N. C. 800; Lapping v. Duffy, 47 Ind. 51; Fordyce v. Nelson, 91 Ind. 447; Bower v. Stone Co., 30 N. J. Eq. 171; Gardner v. Smith, 5 Heisk. 256; County of Des Moines v. Hinkley, 62 Iowa, 637, 17 N. W. 915; Bank v. Kimberlands, 16 W. Va. 555; Pom. Eq. Jur. §§ 169, 1270–1285. Nor is the consent of the debtor necessary to an effectual assignment, in equity, of part of an entire debt. James v. Newton, 142 Mass. 368, 8 N. E. 122. The mere fact that the assignment is in the form of an order to pay does not make it any the less binding or enforceable in equity.

In Christmas v. Russell, 14 Wall. 84, the court say:

"An order to pay out of a specific fund has always been held to be a valid assignment in equity, and to fulfill all of the requirements of the law."

3 Pom. Eq. Jur. § 1280; 2 Story, Eq. Jur. §§ 1040–1043; 1 Am. & Eng. Enc. Law, pp. 834, 835, and cases there cited.

The rule is not different in the federal courts. Savings Inst. v. Adae, 8 Fed. 108; Insurance Co. v. Glover, 9 Fed. 529. It is to be observed, however, that there was no fund in existence when these assignments were made by Price to the respective assignees. He had not yet brought suit to enforce his demand for salvage, although he testifies that he filed his libel on the same day that he made these two assignments. As a matter of law, there could be no fund until the final adjudication and liquidation by the court of his claim. Indeed, it did not necessarily follow that there ever would be any fund in his favor. The assignments were, therefore, merely of a chose in action. But assignments of this character are recognized in equity, and will be enforced. Pom. Eq. Jur. § 1270 et seq.; Story, Eq. Jur. § 1040. In Peugh v. Porter, 112 U. S. 737, 5 Sup. Ct. 361, the supreme court upheld an assignment of part of a fund under circumstances closely analogous to those in the case at bar. There the assignment was of an interest in claims to be established against a foreign government in a mixed commission, in consideration of certain sums of money advanced to procure testimony to sustain said claims. It was held that such an assignment was valid in equity, although made before the establishment of the claim and creation of the fund, and would work a distinct appropriation of the fund in the assignee's favor to the extent of the assignment, within the rule laid down in Wright v. Ellison, 1 Wall. 16. The court say:

"Objection is made to a decree in favor of Peugh, on the ground that he has no equitable lien on the fund in controversy, within the decisions in Wright v. Ellison, 1 Wall. 16, and Trist v. Child, 21 Wall. 441, 447. The rule, as declared in the first of these cases, is that 'it is indispensable to a lien thus created that there should be a distinct appropriation of the fund by the debtor, and an agreement that the creditor should be paid out of it.' 1 Wall. 22. Here, as between Musser and Porter on the one hand, and Peugh on the other, there were words in the agreement of express transfer and assignment of the very fund now in dispute, though not then in existence, which, in contemplation of equity, is not material."

Counsel for Neumann, in citing this case, evidently mistake the word "creditor," in the passage above quoted, to mean the holder of the fund or person on whom the order is drawn. But a close reading of the opinion in Wright v. Ellison, from which the quotation is taken, will show that that word was intended to mean the person in whose favor the order is drawn or the assignment made. For example, in this proceeding, Price would be the debtor, Cofran and Neumann the creditors of Price, and the claimants of the ship and cargo the holders of the fund or salvage award. In other words, the parties occupy the same legal position as if a bill of exchange had been drawn, the only difference being that the orders

to pay in this proceeding are not negotiable paper. Price certainly had the right to assign any future interest which might accrue to him by virtue of a decree in his favor for the salvage services he had rendered the claimants of the ship and cargo, and such an assignment or assignments will be recognized in an equitable proceeding such as this is. This right to assign, as distinguished from the rule precluding the splitting up of causes of action at law, was clearly recognized in Whittemore v. Oil Co., 124 N. Y. 577, 27 N. E. 244, 246. The court used the following language:

"The authorities that are cited hold simply that a creditor cannot split up a single cause of action without the consent of the debtor. The reason for this rule is that to permit a cause of action to be divided would subject the debtor to many embarrassments and responsibilities, not contemplated in his original contract. He has a right to stand upon the singleness of his original contract, and to decline any assignment which may be broken into fragments. Mandeville v. Welch, 5 Wheat. 277. But the rule goes only to the right to sue as assignee of part of a single cause of action. It does not deny the right to sell and transfer an undivided part of a demand."

The last contention of counsel for Neumann relates to the giving of notice. It may be conceded that the rule is as stated by counsel; that is, that, where there are two or more assignments from one person to several upon the same fund or debt, the assignee who first gives notice of his claim to the debtor or holder of the fund, the equities between the several assignees being otherwise equal, ·acquires the prior right to a satisfaction of his demand, although, as a matter of fact, his assignment is subsequent in point of time to that of other assignees. In other words, it is priority of notice to the debtor or holder of the fund, and not priority in point of time of the assignments, which gives preference, and determines the priority between successive assignees to the same debt or fund. The reason of the rule is well stated in Methven v. Power Co., 13 C. C. A. 362, 66 Fed. 113, as follows:

"The question which of different assignees of a chose in action, by express assignment from the same person,—the one whose assignment is prior in time, or the one who first gives notice to the debtor,—will have the prior right, is one in respect to which there is much conflict of authority. * * * In England, since Dearle v. Hall, 3 Russ. 1, and Severidge v. Cooper, Id. 30, it has been the settled doctrine that the assignee who first gives notice to the debtor obtains priority. This is in obedience to the general principle which requires that all transfers of property must be rendered as complete as the nature of the action will permit, in order to make them valid as against subsequent bona fide purchasers for value."

In 1 Am. & Eng. Enc. Law, p. 840, the rule is thus stated:

"If the assignee does not perfect his title by giving notice, a subsequent bona fide purchaser for value from the assignor of the same obligation, giving notice of his assignment, will thereby acquire priority. Between different assignees, the one who first gives notice to the debtor will, as a general rule, have the prior right."

See the cases there cited.

But it is not only necessary that a subsequent assignee should give prior notice; he must, also, be a bona fide purchaser for value. Otherwise, priority of notice will not avail to divest a prior as-

.signment or to supersede it. This qualification is clearly stated by Prof. Pomeroy in his work on Equity Jurisprudence (volume 2, § 695), as follows:

"The equities of the successive assignments being otherwise equal, the priority among them is determined by the order of the notices, rather than by the order of their dates. Giving notice is regarded as equivalent, or at least analogous, to the act of taking possession. The rule thus founded is applied to assignments of ordinary things in action by the creditor party, * * * and to equitable assignments of a fund by the person entitled thereto, and the notice should be given, in the first class to the debtor, * * * and in the third to the holder of the fund. It should be carefully observed, however, that to enable a subsequent assignee to obtain a priority in this manner, by giving the first notice to the debtor or legal holder, he must be an assignee in good faith and for a valuable consideration. If he parted with no consideration, he is a mere volunteer, and stands in the same position as his assignor. If he had notice of the earlier assignment, then he took subject thereto."

The author cites many cases in a note which fully confirm the views he expresses.

Neumann had no notice of Cofran's prior assignment. This is admitted by Price himself. Neumann claims that he first gave notice of his assignment to M. J. Brandenstein & Co., upon whom the order was drawn, and to the marshal and clerk of the court. But the question arises, and must be first determined before any prior notice by Neumann can operate to give him a better right to the salvage award than Cofran has, was he a purchaser for a valuable consideration? Is one who takes an assignment of a chose in action as security for a pre-existing debt, and in no way alters his substantial rights as a creditor, a holder for value? It must be remembered that we are not concerned, in this proceeding, with negotiable instruments. The assignments or orders to pay did not possess all the elements of negotiable paper. They were, in every sense, equitable assignments. A bona fide purchaser is one who, without notice of prior rights, purchases, in good faith, and for a valuable consideration. 2 Pom. Eq. Jur. § 745. A "valuable consideration means, and necessarily requires, under every form and kind of purchase, something of actual value capable, in the estimation of the law, of pecuniary measurement, parting with money, or money's worth, or an actual change of the purchaser's legal position for the worse." Id. § 747. "The conveyance of real or personal property as security for an antecedent debt does not, upon principle, render the transferee a bona fide purchaser, since the creditor parts with no value, surrenders no right, and places himself in no worse legal position than before." Id. § 749; Cary v. White, 52 N. Y. 138; Hart v. Bank, 33 Vt. 252; Clark v. Flint, 22 Pick. 231; Buffington v. Gerrish, 15 Mass. 156; Mingus v. Condit, 23 N. J. Eq. 313; Ashton's Appeal, 73 Pa. St. 153.

In the latter case, the court, on page 162, say:

"A creditor who takes a mortgage, note, or other chose in action only as security for a pre-existing indebtedness, and not for money advanced at the time, is not such a purchaser."

In Depeau v. Waddington, 2 Am. Lead. Cas. (5th Am. Ed.) p. 233, it is stated that:

"Whatever the rule may be in the case of negotiable instruments, it is well settled that the conveyance of lands or chattels as security for an antecedent debt will not operate as a purchase for value, or defeat existing equities."

Counsel for Neumann, in support of the contention that a pre-existing debt is a valuable consideration, cite the cases, in the supreme court of the United States, of Swift v. Tyson, 16 Pet. 1, and Railroad Co. v. National Bank, 102 U. S. 14, and, in the supreme court of this state, the case of Payne v. Bensley, 8 Cal. 260, and many cases in this state following the doctrine laid down in Payne v. Bensley. But the distinction between the questions involved in all of those cases and in the case at bar is that they concerned negotiable instruments, which is not the fact here. It is, unquestionably, the rule of the law merchant that a pre-existing or antecedent debt is considered as a valuable consideration to support a negotiable paper. But this rule does not apply to instruments of a non-negotiable character. The distinction is an important one, and should not be overlooked. It was fully explained in Bank v. Bates, 120 U. S. 556, 7 Sup. Ct. 679. That case, although relating to the priority of two mortgages, involved a state of facts strikingly analogous to those proved in this proceeding, and the law, as there declared by Mr. Justice Harlan, is decisive of the rights of the parties now before the court. That was an action of replevin, involving conflicting claims under two chattel mortgages executed by Freeman Bros. & Co. The first mortgage was executed by Bates, Reed & Cooley on February 7, 1881, to secure both past indebtednesses and future liabilities which might be incurred. A second mortgages was executed to the People's Savings Bank on February 11, 1881, to secure certain demand notes, representing past indebtedness. It did not clearly appear whether the bank, before the mortgage to it was given, had actual notice of the prior mortgage to Bates, Reed & Cooley; but that is immaterial so far as the law there enunciated is applicable to the priority of the two assignments now before the court. The mortgage to the bank was the first one filed in the proper office in Detroit, in compliance with the statutes of Michigan relating to the recording of chattel mortgages. The mortgage to Bates, Reed & Cooley was filed shortly after. The court, after discussing questions not applicable here, said:

"This disposes of all the material questions in the case preliminary to the main inquiry whether the bank—the mortgage to it having been really given to secure past indebtedness of the mortgagors—is, in the meaning of the statute, a subsequent 'mortgagee in good faith.' If not, the mere filing of the mortgage of February 11, 1881, before that of February 7, 1881, did not give it priority of right over Bates, Reed & Cooley; and the mortgage that was in fact first executed and delivered must be held to give priority of right. In Kohl v. Lynn, 34 Mich. 360, 361, the supreme court of Michigan said that 'the statute, which makes a mortgage of chattels, which has not been recorded, void against subsequent purchasers or mortgagees in good faith," uses those terms in the sense which has always been attached to them by judicial decisions.' Guided by this rule, which we deem a sound one, we concur with the court below in holding that the words 'mortgagee in good faith,' mean the same thing as 'mortgagee for a valuable consideration without notice.' It is insisted that the principles announced in Swift v. Tyson, 16 Pet. 1, and Rail-

road Co. v. Bank, 102 U. S. 14, sustain the proposition that the bank was a mortgagee in good faith, although the mortgage to it may be held to have been given merely as security for past indebtedness. The general doctrine announced in Swift v. Tyson was that one who becomes the holder of negotiable paper, before its maturity, in the usual course of business, and in payment of an existing debt, is to be deemed to have received it for a valuable consideration, and is therefore unaffected by any equities existing between antecedent parties. In that case, Mr. Justice Story said that the rule was applicable as well when the negotiable instrument was received as security for, as when received in payment of, a pre-existing debt. In Railroad Co. v. Bank, it was held, conformably to the recognized usages of the commercial world, that 'the transfer before maturity of negotiable paper as security for an antecedent debt merely, without other circumstances, if the paper be so indorsed that the holder becomes a party to the instrument, although the transfer is without express agreement by the creditor for indulgence, is not an improper use of such paper, and is as much in the usual course of commercial business as its transfer in payment of such debt. In either case, the bona fide holder is unaffected by equities or defenses between prior parties, of which he had no notice.' Page 28. Do these principles apply to the case of a chattel mortgage given merely as security for a pre-existing debt, and in obtaining which the mortgagee has neither parted with any right or thing of substance, nor come under a binding agreement to postpone or delay the collection of his demand? Upon principle, and according to the weight of authority, this question must be answered in the negative. The rules established in the interests of commerce to facilitate the negotiations of mercantile paper, which, for all practicable purposes, passes by delivery as money, and is the representative of money, ought not, in reason, to embrace instruments conveying or transferring real or personal property as security for the payment of money. At any rate, there is nothing in the usages of merchants, as shown in this record, or so far as disclosed by adjudged cases, indicating that the necessities of commerce require that chattel mortgages be placed upon the same footing in all respects as negotiable securities which have come to the hands of a bona fide holder for value before their maturity. Such a result, if desirable, must be attained by legislation rather than by judicial decisions."

After referring at some length to authorities which confirm the views expressed by the learned justice, such as Morse v. Godfrey, 3 Story, 364, 389, Fed. Cas. No. 9,856; Dickerson v. Tillinghast, 4 Paige, 215; Rison v. Knapp, 1 Dill. 186, 200, 201, Fed. Cas. No. 11,861; Johnson v. Peck, 1 Woodb. & M. 334, 336, Fed. Cas. No. 7,404; Straughan v. Fairchild, 80 Ind. 598; Kohl v. Lynn, 34 Mich. 360; Stone v. Welling, 14 Mich. 514, 525; Boxheimer v. Gunn, 24 Mich. 372, 379,—he thus concludes the opinion:

"Without further discussion of the authorities cited by counsel, all of which have been carefully examined, we are of opinion that the claim of the bank to be a subsequent mortgagee in good faith cannot be sustained, because the mortgage of February 11, 1881, although first filed, was not given in consideration of its having surrendered, or agreed to surrender, or to postpone the exercise of, any substantial right it had against the mortgagors, but merely as collateral security for past indebtedness. Under such circumstances, the mortgage which was prior in time confers a superior right."

See, further, on the same subject, Gest v. Packwood, 34 Fed. 368; Bank v. Taylor, 4 C. C. A. 55, 53 Fed. 855.

The legal position occupied by the bank in the case cited from the supreme court seems to be, so far as can be intelligently gathered from the established facts and the statements of counsel, the precise situation of assignee Neuman in this proceeding. He simply took the assignment or order to pay as additional security for the payment

of $3,200 then owing to him by Price. He does not appear to have relinquished any right or remedy he had as creditor, or to have prejudiced in any way his rights to claim the payment of this sum from Price, should the order to pay prove unproductive of results. A novation does not seem to have taken place. Such being the facts, he was not a subsequent bona fide holder for value, and any prior notice which he may be deemed to have given the holder of the fund, or the person or persons from whom the money for the salvage services was due, could not give him priority over Cofran's earlier assignment. The latter's assignment, being first in time, is first in right. Calisher v. Forbes, 7 Ch. App. 109; Judson v. Corcoran, 17 How. 611. In this view of the law, it becomes unnecessary to consider the question as to the effect of notice by Neumann to the marshal and the clerk, or to Brandenstein & Co.

I am therefore of the opinion that the assignment to Cofran by Price should be preferred to that of Neumann's, for these reasons: (1) Cofran's assignment was first in point of time; and (2) Neumann's assignment, being, like Cofran's, for a pre-existing debt, did not constitute Neumann a subsequent bona fide holder for a valuable consideration. Therefore, any prior notice of his claim, given by him to the debtor or legal custodian of the fund, could not give him any priority over Cofran's earlier assignment. It follows that Cofran's claim should be allowed in full, to wit, in the sum of $1,585.42; the remainder, after payment of costs, to go in part satisfaction of Neumann's claim of $3,200. The exceptions of petitioner Neumann will be overruled, the report of the commissioner confirmed, and a decree drawn up and entered in accordance with these views.