## The Cyclone. (Two Cases.)

*(District Court, S. D. New York.   May 4, 1883.)*

1. SALVAGE SERVICE—BARK LOADED WITH NAPHTHA—FIRE.

   Where the bark C., being loaded with naphtha in her hold, took fire at night while lying at the oil docks and was towed out into the stream and the fire extinguished by two tugs, at some personal hazard of the crews, *held,* the service was one of salvage, and that the vessel should pay 15 per cent. and the naphtha 25 per cent. of its value, in consideration of the extra hazard in the salvage service occasioned by the naphtha.

2. SAME—TUG ASSISTING.

   The sum of $35 was also awarded to another tug for a short service in assisting to extricate her.

3. SAME—PERSONAL INJURY TO SALVOR—COMPENSATION.

   One of numerous salvors who suffers a special loss through a hazard to which all are exposed, may be compensated for this special loss, as for personal injuries in falling down an open hatch while carrying the hose on board the vessel.

In Admiralty.

*R. D. Benedict,* for the J. H. Starin.

*Beebe, Wilcox & Hobbs,* for the Purcell.

*Scudder & Carter* and *Geo. A. Black,* for claimant.

BROWN, J. The libels in the above two cases were filed by the owners of the steam-tugs Levy and Purcell to recover compensation for salvage services rendered to the bark Cyclone and her cargo, consisting of —— barrels of naphtha, in rescuing them from a fire which occurred at Pratt's oil docks, near Bushwick creek, Brooklyn, on Sunday evening, August 8, 1880. The fire broke out about 9 P. M. on board the bark Nictau, which was moored in the slip on the north side of the wharf. The Cyclone was moored at the end of the wharf, her stem heading down the stream, and her stern extending northward beyond the pier. The spanker boom of the Nictau projected over the port quarter of the Cyclone, between her main and mizzen rigging, and the latter soon caught fire near the stern. The captain called for assistance to some small steamers that were passing at a distance, but, not being able to obtain help, jumped ashore, cast off her lines so that the Cyclone might swing off and away from the blazing boat near her, and ran towards the pier above for assistance. The tide was flood, and as the boat swung off the crew left her. The tide set her stern somewhat into the slip, and at the same time carried her bows around until they struck and became entangled in the piles near the end of the Manhattan railroad pier next above. At this time the steam-tug Levy had backed up to the bows of the Cyclone, and some of her own men, with others from the pier who had jumped aboard, fastened her hawser to the Levy, with which the latter attempted to pull the Cyclone away from the pier and out into the stream for the purpose of extinguishing the fire. The hawser breaking, another from the Levy was attached, with which she was in a few moments hauled out some distance into the stream. While endeavoring to effect this removal the Levy had her bows across the tide, and was held in position by another tug, the Joe, which pushed against her bows to prevent her swinging upwards with the tide. After getting out into the stream a short distance the anchor of the Cyclone was let go; but not having sufficient chain she was not held fast, and drifted slowly upward. Meantime the Levy, having a powerful engine, with hose designed to extinguish fires, was playing upon her. When in the stream the Levy remained alongside the Cyclone; her hose was taken on board the latter, and the Levy's crew, with those who had come aboard from the wharf, used their best endeavors in extinguishing the fire. Shortly after they had got out into the stream, the steam-tug Purcell, which also had powerful appliances for extinguishing fire, came along-side, and joined her efforts with those of the Levy. For some period, more or less, after

the Purcell arrived, the nozzle of the Levy's hose was split; but it was temporarily repaired, and she continued playing upon the fire as before. The fire was finally extinguished at about 1 o'clock at night. The cabin had been burned out, the bulk-head charred, and some holes had to be cut into the deck for the purpose of getting at the fire. The value of the vessel as saved was appraised at $6,500, and that of the naphtha, which was in barrels in the lower hold, at $7,553. The latter was uninjured. It was about a quarter past 9 o'clock when the Levy took hold. An extinguisher, belonging to the fire department, arrived at the scene of the fire a little after 10. The Nictau was entirely consumed. Some other vessels· also caught fire. A number of fire engines came upon the adjacent wharves, but under circumstances in which they would have been unable to render any assistance to the Cyclone.

That the services rendered by the Levy and the Purcell were in the nature of salvage is not contested. The questions submitted to the court upon the evidence relate only to the compensation to be awarded. Several recent cases of fire among shipping have been referred to, having some analogy to the present. *The Jonathan Chase*, 2 Fed. Rep. 268; *The Suliote*, 5 Fed. Rep. 99; *The B. C. Terry*, 9 Fed. Rep. 920; *The Rialto*, 15 Fed. Rep. 124.

There are two circumstances in the present case which are well-recognized grounds for enhancing salvage reward : *First*, the extremity of the danger of the Cyclone, and the necessity of immediate relief; and, *second*, the personal hazard which attended the service, owing to the inflammable and explosive character of the cargo in her hold, and its exposed condition, the hatches being all open. At the time when the Levy first arrived, the fire was already well under way astern, and but for the timely assistance of. the Levy and the Purcell, there is no reason to suppose she would have escaped entire loss. It was nearly an hour afterwards before the Havemeyer arrived, and no other valuable help is shown to have. been at hand at that time. The danger of fire reaching the hold, or of such heat as might cause an explosion in the naphtha there, is also an important consideration. There had already been one violent explosion from the fire either on the Nictau or one of the other vessels; and the danger on board the Cyclone from this source was one which might well make persons reluctant to remain on board, or so near her as was necessary to extinguish the fire. Her hatches being open, there was the further danger of fire being carried into the hold from the falling pieces of blazing material, some of which burned the bottom

of the boats. The open hatches also exposed the men, in the hurry and confusion of the night, to danger. One, John Graham, while holding the hose, fell through and went down into the hold, causing nim considerable injury, for which he was treated some weeks afterwards at the hospital. Another went over the hatchway and was only saved by clinging to the coamings.

In the case of *The Suliote, supra,* Mr. Justice BRADLEY says that "salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagant; otherwise that which is intended as an encourgement to rescue property from destruction, may become a temptation to subject it to peril." In that case the value of the ship and cargo saved from the fire amounted to $247,000, for which, nearly $20,000, being 8 per cent. of the whole sum, was allowed to the salvors.

In *The B. C. Terry, supra,* the sum of $1,600 was awarded upon property saved amounting to $9,700; and in the case of *The Rialto* the value of the cargo saved was $378,000, and the sum of $2,500, was awarded. In the last case the services were comparatively slight; in the former there were no elements of danger or hazard, and other relief was at hand. In the present case the services were not only much longer, but the exigency of the Cyclone and the danger of those on board of her were much greater.

In the case of *The Tees,* 1 Lush. 505, Dr. LUSHINGTON awarded the salvors £1,000, upon a value of £12,350, or a little less than 8 per cent.; and on the Pentucket, rescued from the same fire, he allowed £300 upon a value of £900, or 33⅓ per cent. In those cases the special circumstances are not stated, except that "the surrounding warehouses were burning fiercely; that the fire had communicated itself to the upper sails of the vessels;" and that "the salvage service was executed at some peril of life." On the whole, I think an award of 15 per cent. to be paid by the ship upon her value, as appraised, and of 25 per cent. to be paid by the owners of the cargo upon its appraised value, amounting in all to $2,863.25, will be a proper and just award in this case. The dangerous character of the cargo, all of which was saved unharmed, and which largely increased the danger of the salvors, seems to me a sufficient reason why the cargo should pay a larger percentage for its rescue in safety.

There is not sufficient reason for distinguishing between the Levy and the Purcell in the services rendered. If the latter was more active or more serviceable after she came up, the former was the first upon the scene, and the first to commence playing upon the flames, when every moment was precious. The services of the Joe in holding the Levy against the tide while preparing to pull the Cyclone away from the wharf, though brief and slight, are entitled to some recognition. She was occupied in this service probably not more than five or ten minutes, about one-tenth of the time occupied by the Niagara in somewhat similar but much more important services in the case of *The Jonathan Chase*, 2 Fed. Rep. 268, for which Benedict, J., allowed the latter $350. I allow to the owners of the Joe and her crew, but without costs, as their petition was filed during the progress of this trial, the sum of $35,—one-half to go to the owners, and of the other half $7.50 to her captain, and the rest to be divided equally among her crew.

Of the residue of the above award, one-fourth should go to the owners of the Purcell, and one-fourth to the owners of the Levy. From the remainder there should be allowed, first, $100 to John Graham for his expenses and personal injuries arising from his fall while on board the Cyclone engaged in handling the hose in extinguishing the fire. The open hatches exposed all to equal danger; and this danger, incident to rendering assistance, is considered in the amounts charged upon the saved property. When all the persons exposed to such a danger are before the court, I consider it but just that those who have suffered the evil results arising from that danger should have some recognition and compensation for their special loss, on the same principle that a vessel would be allowed for hawsers or lines destroyed in rendering the salvage services. It is in accordance, moreover, with the principle on which salvage is awarded, that in distributing the award some recognition should be made of the special losses or injuries which those engaged in rendering the services may have suffered; for all will be the more ready to face danger upon the assurance that any special injury which may happen to fall upon any one will receive due recognition and compensation. In the case of *The Marquis of Huntly*, 3 Hagg. 246, where three persons had lost their lives in endeavoring to go for a government steamer by request of the ship's agent, on an errand not immediately connected with the salvage itself, and not contributing to it at all, £100 were allowed by Sir John Nicholl to the families of the deceased.

Of the residue of the award $250 should be allowed to the captain of the Levy, and $250 to the captain of the Purcell; the remainder to be divided equally among the remaining 16 men who rendered assistance, including the crew of the two tugs, Graham, and the other persons whose names have been presented as petitioners on the trial, with costs to the libelants in each case.