THE ELMBANK.

WEIR et al. v. PRICE.

(Circuit Court of Appeals, Ninth Circuit. June 27, 1895.)

No. 199.

1. SALVAGE COMPENSATION—EXTINGUISHING FIRE BY CHEMICALS.
    A cargo of sulphur having taken fire at the wharf, water was pumped in for several hours by tugs and by the city fire department, without apparent effect. The underwriters then employed a skilled chemist, who, with the master's assent, took charge of the vessel, and, by generating carbonic acid gas and discharging it into the hold, finally succeeded, with the aid of several chemical engines belonging to the fire department, in extinguishing the fire. At first there was probably some danger of an explosion, and the time employed was five or six days. The value of vessel and cargo as saved was $97,000. *Held*, that an award of $10,000 to the chemist was excessive, and should be reduced, on appeal, to $6,000. 62 Fed. 306, reversed.

2. SAME—SERVICES RENDERED UNDER CONTRACT.
    The fact that salvage services are rendered under a contract of employment by which the salvor will be compensated whether successful or not is a matter which should be considered in reduction of the award.

Appeal from the District Court of the United States for the Northern District of California.

This was a libel by Thomas Price against the bark Elmbank and cargo to recover compensation for salvage services; Andrew Weir and others being claimants of the bark, and John Stauffer & Co., claimants of the cargo. In the district court libelant was awarded $10,000. 62 Fed. 306. The claimants both of the vessel and her cargo appeal.

Andros & Frank, for appellants.

Howell A. Powell and Walter G. Holmes, for appellee.

Before GILBERT, Circuit Judge, and KNOWLES and BELLINGER, District Judges.

GILBERT, Circuit Judge. The appellee was the libelant of the ship Elmbank, her cargo, etc., for salvage services rendered in extinguishing a fire that broke out in the cargo while the vessel lay at her dock in San Francisco. The cargo consisted of sulphur in sacks. The fire broke out at about noon of Saturday, the 10th day of June, 1893. A few minutes later the fire engines of the city fire department of San Francisco arrived. The firemen took off the hatches, and pumped large quantities of water into two of them. Three steam tugs came alongside and offered assistance, which was refused. The firemen continued to pour in water, and made two additional holes in the deck for that purpose. The master of the Elmbank engaged the steam tug Fearless to assist in pumping in water, at an agreed compensation of $50 per hour. She passed her hose on board and commenced work. The fire, instead of being abated by the large quantity of water which was poured into the hold, appeared to be gaining in intensity. At about 3 o'clock, W. H.

Dutton, the agent of the underwriters of the vessel and cargo, who had arrived upon the scene, remembering that upon a previous occasion he had seen fire in a ship's hold extinguished by the libelant by the use of carbonic acid gas, went to the libelant's office, to procure his services. He returned with the libelant, and on arriving at the vessel, with the consent of the master, placed the libelant in charge of the efforts to extinguish the fire. The libelant directed that the engines cease pumping water into the ship, and ordered that all the hatches and other openings of the deck be tightly closed. He caused empty barrels to be procured, and to be fitted with the necessary tubes for the introduction of gas into the hold of the vessel. Into the barrels, eight in number, he caused large quantities of fragments of marble to be placed, and to be mingled with muriatic acid, for the generation of the gas. In the meantime, while these preparations were being made for the production of carbonic acid gas, chemical engines belonging to the fire department of the city of San Francisco were sent to the scene of the fire. These engines were intended to be used with bicarbonate of soda and sulphuric acid, from which chemicals carbonic acid gas is more speedily evolved than from the use of muriatic acid and marble dust. By 5 o'clock carbonic acid gas was being introduced into the vessel from the chemical engines, and by 8 o'clock, and perhaps earlier, the barrels, with their contents, were in operation. By 2 o'clock in the morning the chemical engines were withdrawn, for the reason that their supply of chemicals was exhausted, and none other could then be procured. The fire, however, was then under control. By Sunday morning the deck of the vessel had cooled, and the fire appeared to be extinguished, but the libelant continued to introduce gas from the barrels until the following day. By noon on Monday, upon the libelant's suggestion, the tug Fearless began to pump the water out of the vessel's hold. This would appear, upon the libelant's own testimony, to have been an error, for at 10 o'clock p. m. it was discovered that fire had again broken out, owing to the fact that, with the pumping, fresh air had been introduced into the hold, and had reached the sulphur that had been burning, before it had cooled sufficiently to prevent its reignition. Mr. Dutton, who was at the ship at the time, telephoned to the fire department again for the chemical engines, and sent for the libelant, who was at his residence. Six chemical engines arrived and were set to work, and the barrels were again brought into service. By 7 o'clock on Tuesday morning it was believed that the fire was again extinguished. The libelant continued, however, to cause gas to be introduced by the use of the barrels until Wednesday morning, when the hatches were opened, and it was found that the fire was extinguished. The libelant was engaged at the vessel almost continuously from Saturday at 3 p. m. until Wednesday morning. He remained thereafter for several days, superintending the discharge of the cargo. On Thursday or Friday he was notified by the master of the vessel, on his own behalf and on behalf of the underwriters, that his services were no longer required, but he continued to remain, stating in reply that

he should make no additional charge for what he should do thereafter. The value of the vessel as saved was $76,000, and the value of the cargo as saved was $21,000. The ship paid in general average net $16,310. The cargo made $5,735.58, besides paying its freight, $4,984.32. The libelant was awarded salvage in the sum of $10,000. The decree is appealed from upon the ground that the award is excessive.

The elements that enter into the adjustment of the amount of the award in a salvage case are, in general: (1) The value of the property by the use of which the salvor rendered the salvage service, and the danger to which that property was exposed; (2) the skill with which the services were rendered; (3) the time devoted thereto, and the nature of the labor; (4) the risk incurred by the salvor; (5) the value of the property salved, and the degree of danger from which it was rescued.

The consideration of the first of these elements is not involved in this case, for the libelant risked no property of his own. His skill as a chemist is unquestioned, and there is no doubt that his services were rendered in a skillful manner. The fact that fire may be extinguished by the use of carbonic acid gas, and that the gas may be generated from muriatic acid and marble dust, may be said to be fairly well known, and to be matters of common knowledge. It is also within common knowledge that the fire department of nearly every considerable city of the United States is fitted with chemical engines for extinguishing fires by the use of carbonic acid gas. The San Francisco fire department had eight such engines. But the process of introducing gas from retorts such as those improvised by the libelant may be said to require practical skill. The idea of extinguishing the fire in this case by carbonic acid gas was suggested by Mr. Dutton. He knew the libelant was a skillful chemist. He knew also of other practical chemists, and it is undisputed that there were several within his reach. If he had failed to secure the services of the libelant, therefore, he would have applied to others. The libelant faithfully and efficiently superintended the use of the agencies which he himself suggested and those that were placed at his disposal.

The time the libelant gave to the work of extinguishing the fire, and for which he was employed by the underwriters, included 5 or 6 days, two of which were given to the first fire, and the remainder to the second; and during that time his service was continuous, with the exception of short intervals for rest. The time he devoted to examining the condition of the hold and the cargo after the final extinction of the fire, and to superintending the unlading of the cargo, covered a period of 10 or 12 days; but the service so rendered was not within the terms of his employment, and was not rendered at the instance of either the master or the underwriters, but, on the contrary, was against their objection. The evidence proves, moreover, that soon after the second fire was extinguished the libelant was informed by the master that his services were not longer needed, either by him or the underwriters, and in response thereto

he stated that no additional charges should be made by him for his time or labor after that date.

Concerning the personal risk to the libelant, the evidence tends to indicate that, at and before the time when he arrived at the vessel, the introduction of water in the manner in which it was being poured into the ship produced currents of air, which distributed flowers of sulphur in impalpable dust through the unfilled spaces of the hold, and that if by any means fire had been communicated to the dust so commingled with the air there was liable to occur what is known as a "dust explosion," such an explosion as has upon occasions occurred in flour mills and in coal mines, and that the intensity of the explosion would have depended upon the proportions in which the dust and the air were present, and the extent of the space which they occupied in the hold. The danger, if it existed, however, was largely obviated by closing the hatches and shutting off the access of currents of air, and it was evidently not believed to be imminent at any time, for no difficulty was encountered in inducing a sufficient number of men to go upon the deck to batten down the hatches and to go into the rigging to make tight the openings in the masts, and enough men thereafter to remain on the deck or sufficiently near the vessel to conduct the operation of the chemical engines and the improvised retorts. If there were danger, it was at all times shared by the men in charge of the engines, and the gang of four or five men in charge of the retorts; and, while the evidence may be said to establish the fact that the danger existed, it fails to convince us that the peril was great, or that it endured for more than a comparatively small portion of the time. There appears to us in the testimony of the libelant an exaggeration of the danger. He says:

"I said, on entering the ship, that unless they did something to prevent the access of the large volume of air which was entering into the ship, all the hatches being open, the masts being all hollow, and creating a draught, that there would be at any moment a very dangerous explosion."

He declared that the masts were "open at the foot, and were acting like the stack of a reverberatory furnace." In short, he locates the source of the danger principally in the hollow masts, which caused draughts from below, and operated like furnace stacks. The evidence elsewhere shows beyond question that the masts, although they were hollow, were closed below, and that there was no opening whereby the air could pass through them. The currents of air through the open hatches were stopped immediately after the arrival of the libelant, for he testifies that he ordered the captain to close down the battens of all the holds, and sent the sailors to the mast head to make them as tight as possible.

In the danger of the loss of the vessel and cargo must be found the principal element of salvage service in this case. The value of the rescued property was $97,000. If the fire had not been checked, the loss would, of course, have been total. The important inquiry is, what was the risk from which the libelant's efforts rescued the property? There is nothing in the nature of a fire of sulphur which

prevents its extinction by means of water in the ordinary manner. The failure of the efforts of the firemen in this case may be attributed to their inability to ascertain and reach the location of the fire. The smoke and fumes of sulphur prevented an inspection of the hold. The result was that water could only be poured into the vessel until it should rise to a sufficient height to reach the seat of the fire. Up to the time of the arrival of the libelant at the vessel, the water had not touched the fire. In the light of the evidence as to the location of the fire, as ascertained subsequently, it is probable that, had the use of water been continued for a short time, perhaps one or two hours, the fire would have been extinguished. The evidence also tends to show that the fire could have been successfully overcome by the use of the chemical engines of the fire department of San Francisco. Four only of the engines, as we have seen, were used. There is some conflict in the testimony as to whether their use was suggested by the libelant or by Mr. Dutton. Perhaps it is not material which; but an examination of the testimony leaves the conviction that the suggestion was Mr. Dutton's. The gas-producing capacity of the four chemical engines that were used was considerably greater than that of the eight barrels, and it is probable that if all the chemical engines, of which there were eight, had been used promptly, even after the employment of the libelant to take charge of the fire, the fire would have been extinguished even sooner than it was.

The agreement under which the libelant in this case undertook to render his services may be properly considered in determining the amount that should be awarded him therefor. The testimony concerning the terms of the agreement is not harmonious. The libelant testifies that no conversation on the subject occurred between him and Mr. Dutton until after they had left the office, and that while they were on their way to the vessel there was a conversation, the substance of which was that the libelant would charge for salvage, and that he would make no charge if he failed to save the property. Mr. Dutton, on the other hand, testifies that the only conversation on the subject occurred in the office. In this he is corroborated by another witness who was present. The conversation, as detailed by Mr. Dutton, was as follows:

"I said: 'Professor, what are you going to charge us for this, to put out this fire?' He laughed and said: 'I will charge you— I will charge you what you gentlemen call "salvage."' I kind of hesitated at that. He laughed, and said: 'Oh, well, there will be no trouble about our coming to an arrangement, Mr. Dutton.' I said: 'No, professor, I guess there will be no trouble about that. We will come to an arrangement easy enough.' He said: 'Yes. It will depend on the amount of work I have to do how much I will charge.'"

If these are the terms on which the libelant was engaged,—and we are of the opinion that they are,—he was not a volunteer salvor in rendering the service, but he was an employé for hire, working under a definite understanding with his employer, the purport of which was that if his efforts were successful, and the property were rescued from the fire, the amount of his charge would thereby be enhanced, and would be as for salvage service, yet, whether successful or not,

he would nevertheless be entitled to compensation for his work. His contract was with the underwriters, and although the master of the vessel consented to his supervision of the efforts to extinguish the fire, and placed the property under his control, thereby subjecting it to his lien for salvage, the underwriters were directly responsible to him for his compensation, and he evidently so understood it. In procuring marble dust and muriatic acid and other material to be used, he caused the same to be charged to the underwriters. Afterwards, and before bringing this suit, he received from the underwriters $300 on account of his demand.

There is a recognized distinction between a voluntary and an employed salvor. Said Dr. Lushington in The Undaunted, Lush. 90, 92:

"There is a broad distinction between salvors who volunteer to go out and salvors who are employed by a ship in distress. Salvors who volunteer to go out go out at their own risk, for the chance of earning a reward, and if they labor unsuccessfully they are entitled to nothing. The effectual performance of salvage service is that which gives them the title to salvage remuneration. But if men are engaged by a ship in distress, whether generally or particularly, they are to be paid according to their efforts made, even though the labor and services may not prove beneficial to the vessel."

In The Sabine, 101 U. S. 384, the court, after approving the doctrine of the case last cited, said:

"Reported cases may be found where the owners or insurers of such property, being informed that the property was in peril, sent out vessels and mariners for its assistance and relief; and in such a case it is undoubtedly true that the persons employed, both for their services and for the use of the vessels or other appliances, may maintain a libel in personam to enforce the payment of just compensation for all such services."

In The Queen of the Pacific, 21 Fed. 460, 471, it was held that in a case where there was a request for the services, and the compensation did not depend on success, the amount of salvage might very properly be diminished thereby.

In view of all the circumstances, we are of the opinion that a just estimate of the salvage service rendered to the Elmbank and her cargo must include the services of many others besides the libelant. It must include the men who had charge of the chemical engines and the retorts, and who, in discharging their duties, incurred the same danger that was incurred by the libelant. It must include the efforts of the fire department in partially filling the hold with water, thereby occupying the space which must otherwise have been filled with carbonic acid gas in the subsequent efforts to extinguish the fire, for, although the firemen may not receive salvage compensation, it is proper to consider the extent to which they contributed to the result in apportioning the salvage to others who have earned it. There should also be considered the efforts of Mr. Dutton, to whom must be accorded the merit, if any there be, of suggesting the use of carbonic acid gas, and of suggesting the use of the chemical engines. A proper award for all the salvage in the case might justly exceed the amount that has been decreed to the libelant, but we are unable to find that his services alone should be compensated in that amount.

In our judgment, the award to him of $10,000 gives undue prominence to the part he took in rescuing the property. We are aware that this is a subject upon which no definite rule can be laid down, and that, in determining the amount of compensation, each court must be guided largely by its own judgment, having in view as nearly as possible the theory upon which salvage is awarded, and the purpose of its allowance.

Said Mr. Justice Bradley in The Suliote, 5 Fed. 99, 102:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune, conferred without regard to the loss or sufferings of the owner, who is a public enemy, while salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor."

In view of all the facts, it is our judgment that the amount awarded the libelant by the district court is excessive, and that a liberal allowance would be $6,000. The decree is therefore reversed, at the cost of the appellee, and is remanded for further proceedings in accordance with this opinion.