## THE THETA.

(District Court, S. D. New York. February 8, 1905.)

1. SALVAGE—AMOUNT OF AWARD—SAVING OF DERELICT.

A steamship bound from Norfolk to Boston, laden with coal, when off the coast of Delaware picked up a lumber-laden schooner which had been seriously injured in a collision and abandoned by her crew, and towed her to the port of New York. When found, the schooner's main deck was under water, and the towing was slow and difficult, owing to strong winds, and required 2½ days, with the assistance of tugs later employed by the steamer, which had previously broken two hawsers. It was also attended with some danger to men who were sent on board the schooner to steer her. The steamer was worth $275,000, and the saved value of the schooner and cargo was about $10,000. A considerable expense was incurred by the steamer. *Held*, that she was entitled to an award of 50 per cent. of the saved value of the schooner and cargo after paying the expenses.

[Ed. Note.—Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

2. SAME.

In making a salvage award for the bringing into port of a derelict, the danger to navigation from her remaining afloat should be taken into consideration, and the award should be liberal, and such as to encourage the rendering of such services.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, §§ 69, 83.]

In Admiralty. Suit to recover salvage.

Butler, Notman & Mynderse, for libellants.

Wing, Putnam & Burlingham, for claimant.

ADAMS, District Judge. This action was brought by the United States & Porto Rico Navigation Company, the owner of the steamer Pathfinder, the New York and Porto Rico Steamship Company, the

charterer of the same, Arthur D. Curran and Smith P. Burton, Jr., the sub-charterers of the same, and James B. Parse, the master of the same, on behalf of himself and 27 other members of the crew, against the British schooner Theta and her cargo of lumber, to recover salvage compensation for bringing the schooner and cargo into port.

The steamer was bound from Norfolk to Boston with a full cargo of coal. On Sunday morning September 11th, 1904, about 9 o'clock A. M. she sighted the schooner. The steamer was then about 15 miles S. S. W. from the Five Fathoms Bank Lightship and steering N. N. E. The schooner was directly ahead of the steamer and about 10 miles from the lightship and still had some of her sails set. She was heading about N. W. It is alleged in the answer, verified by the master of the schooner, that she had been in a collision that morning with a steamer, about 1 o'clock, while on a voyage from Brunswick, Georgia, to Dorchester, New Brunswick, and so much injured that the hull filled and she threatened to capsize. She was abandoned by her master and crew about 5:30 o'clock of the same morning.

The steamer approached the schooner under reduced speed and steamed around her to investigate her condition. When it was found that she was abandoned, a life boat was launched, with some difficulty, and manned with the second mate and 4 men, who went aboard. At the time there was a strong wind from the north-east, which caused a choppy sea. When these men came back to the steamer and reported the schooner's plight, a new 6 inch manilla hawser, 130 fathoms long, was prepared as a tow line and run to the schooner with the life boat, by means of a small line and the schooner's hand winch. The main decks of the schooner were under water, also part of the deck cargo, and 3 or 4 feet of water were upon the cabin floor. The wheel of the steering gear was carried away, with the blocks and tackle attached to it. The schooner's starboard quarter was cut off. It was about 2 o'clock in the afternoon when the towing preparations were completed and the steamer started slowly ahead but in about 5 minutes the hawser parted in the middle, about half way between the vessels. The whole length of the hawser was out in addition to about 20 fathoms of the schooner's anchor chain, to which it was shackled. The steamer had a steel hawser aboard, which was then fastened to the schooner's port anchor chain and the towing was resumed about 5:30 o'clock. The vessels proceeded very slowly until daybreak the next morning, and up to that time made some 15 or 16 miles. The schooner had sheered a good deal during this towing, which caused more or less of a strain upon the steamer's engines. No men from the steamer had been left aboard the schooner during the night but in the morning of the 12th, the steamer was stopped and the life boat launched again, this time manned by the master, second mate and 5 men. The object of the visit was to rig up steering gear, for which purpose blocks and tackle, with other necessary gear, were taken from the steamer. Over the schooner's starboard quarter, where it was cut off, a spanker gaff was rigged from which a tackle was run to the tiller. On the port side a tackle was hooked outside of the quarter of the schooner, to assist in the

steering. This work occupied about 2 hours. The master returned to his steamer but the men remained on the schooner all day steering her, which was troublesome work but done effectively. During the day, the wind shifted to the south-west and there was a fresh breeze which created a choppy sea in the afternoon. The sea had gone down during the morning, so that it was better for towing than it had been the preceding day. Towing was continued during the day but at 8 o'clock that night, the steel hawser parted from an increase of the sea. The master then signalled to the men on board the schooner to anchor, which they did, with some difficulty, in 12 fathoms of water about 4 miles off Shrewsbury. About this time two tugs appeared on the scene and were employed by the master of the steamer. They attended the tow thereafter and did part of the towing. The hawser had been buoyed as a matter of precaution, so that it would not be lost if parted. The steamer stood by and the men were taken off, excepting 2. When those who came to the steamer had obtained something to eat, the second mate, the carpenter and 1 man were sent back to the schooner to remain during the night. That night, the wind shifted to north north-east and blew strongly, making a choppy sea, and it rained hard. On the 13th, the wind was high from the north-east, making some sea. In the morning, the second mate came to the steamer and the master sent 3 or 4 men back with him to heave up the anchor, but one of the chain shackles jammed on the windlass and it was cut off with considerable trouble. In the meantime, the steamer had picked up the hawser and the towing to New York was resumed. After that the hawser held until the turn around the Southwest Spit was being made.

The Pathfinder was a 1400 horse power, 3 years old steel freighting steamer, 1800 tons net and 2900 tons gross register. She was 318 feet long, 44 feet 11 inches beam and had 24 feet depth of hold. She was fully loaded with coal and left Norfolk September 10th. After she had brought the schooner into port, she proceeded, on her voyage to Boston.

The Theta appears to have been a British schooner of 420 tons register. She was 134 feet long, and 35 feet beam and 12 feet depth of hold, built in 1901, and hailing from Windsor, Nova Scotia. She had when starting on the voyage a full cargo of 385,000 feet of lumber, partly on deck.

The saved lumber, some 257,690 feet, was sold in New York and brought $2,557.52, net, and it is stipulated that this amount constitutes the avails of the cargo for salvage purposes.

There is a dispute as to the value of the vessels.

The libellants contend that the Pathfinder was worth $275,000. This valuation was partly based upon a sale of the steamer to the U. S. & Porto Rico Navigation Company in December, 1902, at $319,000, a portion of which was paid in bonds of that company. After allowing for depreciation, it is testified that the vessel at the time she rendered these services, was worth the sum contended for and I find nothing in the record to overcome or affect the estimate. It is therefore adopted.

The libellants contend that the salvage value of the schooner was $11,875, as testified by an expert called to appraise her in her damaged condition. This was based upon an original cost of $28,000, when she was launched in June, 1901, as stated by the managing owner; an annual depreciation of 6% for 3¼ years, and the cost of repairing, estimated at $10,000. It, however, appears by the testimony of the managing owner that he confounded this vessel with another when he stated that this one cost $28,000, and that her actual cost was $21,-200. Testimony as to similar vessels built about the same time shows that the estimate of $21,200 fairly represents the original value. Proceeding upon that and allowing for the testified depreciation and cost of repairs, $7300 may safely be assumed to represent the damaged value when she was saved. Adding the agreed value of the cargo to this amount, it appears that $9857.52 represents the total saved value.

Some expenses were incurred by the steamer incident to the towage. They were as follows:

| | | |
|---|---|---|
| Value of manilla hawser, practically destroyed | | $106 00 |
| Value of wire hawser        do        do | | 125 00 |
| 40 extra tons of coal at $4 | | 160 00 |
| Watching Theta and cargo | | 118 00 |
| Towage services of tugs, viz: Atwood | 125 00 | |
| Unique | 100 00 | |
| | | 225 00 |
| Wharfage paid for lighter in discharging lumber | | 4 00 |
| Entering at Custom House, New York | | 3 17 |
| Tugs shifting lighter | | 8 00 |
| Pilotage on Theta | | 47 32 |
| Medical inspection on Theta | | 3 00 |
| Wharfage        do 30 days | | 153 00 |
| Longshoremen docking Theta | | 3 20 |
| Kerosene oil & wicks used on lighter | | 1 64 |
| Making a total of | | $957 33 |

The libellant, the New York & Porto Rico Steamship Company paid these items and is first entitled to recover this sum. The Le Jonet, 1 Asp. Mar. Cas. 438; The Agnes Manning (D. C.) 59 Fed. 481.

The libellants claim to be entitled to a salvage remuneration of 50% of the balance of $8900.19, on account of the Theta being a derelict, the probability of her drifting ashore, and thereby becoming a total loss, and the removal, in any event, of a dangerous obstruction to navigation; and further because the libellants' services were highly meritorious, prompt and successful and were performed at some risk to the steamer.

The master of the Theta, as claimant, while admitting that the services were of a meritorious character, urges that they were not extraordinary and involved no elements of hazard or special difficulty; he also urges that whatever mishaps attended the venture were due to the ignorance and inexperience of the Pathfinder's officers as to ocean towing; and that the salvors are therefore entitled only to a moderate compensation.

The services were certainly timely and successful. Without them, the probability is that the schooner would soon have drifted ashore, in the vicinity of Cape Henlopen, and become a total loss. The tow-

age, owing to the fact that the vessel was wholly submerged, was very difficult and required great patience and care. The deviation of the steamer from her course to Boston to tow the schooner into New York must also be considered, and the risk of danger to the steamer by getting the broken hawsers entangled in her screw. I do not find that there was any lack of skill in conducting the enterprise but, on the contrary, that it was carried on to the successful end with care and prudence.

In many cases cited by the libellants, 50% has been allowed. In many others, cited by the claimant, a less percentage has been awarded. It is said that the rule to allow 50% in case of a derelict no longer obtains. The Janet Court, 8 Asp. Mar. Cas. 223. That was a case of salving an abandoned barque of the value, with cargo and freight, of £7350. £3000 were allowed to a steamer of the value of £15,000, as a salvage for 8 days' services. It was there said (224):

"In this case a derelict vessel, an iron barque of 900 tons register, was picked up to the westward of and not very far from the Bermudas, and it was decided on account of the weather, and probably wisely, to tow her to St. Thomas. The main element, of course, in this case is that the vessel was derelict. The fact that the subject of a salvage is a derelict does not now, and I doubt if it ever really did, carry with it a right to remuneration consisting of one-half, or a third, or any specific proportion of the value of the property salved. There is no magic in the term 'derelict'; but what is important is that it imports a certain condition of things introducing elements which tend, on the general principles of salvage, to raise the amount of salvage reward. There are three conditions which a derelict generally fulfills. The first, and perhaps the main, element to be considered, in an award of salvage, is the risk to which the salved ship and her cargo are exposed. In the case of a derelict this risk is generally very high; and in this particular case it is difficult to my mind, to imagine circumstances under which the risk to the vessel salved could have been greater. She was abandoned by her crew. She was dismasted, and therefore not easy to be seen by a passing vessel; and, more than that, she was left by her crew in such a position, with the hatches open, that she probably would before very long have foundered. I do not say that the abandonment was in any way wrongful, for they no doubt believed that she was in a hopeless condition, and that it was the best thing to be done. She had already some water in her, and every wave that washed over her added to it, and made it more likely she would founder. The second consideration to which the case of a derelict gives rise, is that she has no men on board her, and has to be approached without such aid as they could afford; that, although in calm weather there is no great difference in approaching a derelict as compared with any other vessel, if there is any sea the difficulty is increased, because there is nobody to let down a ladder or throw a rope, or otherwise assist in the attempt to board from a boat. In the present instance, perhaps, this difficulty was not very great. Then there is another condition which, in this case, was fulfilled to a very considerable extent, because it was necessary to put four men on board the vessel, whose position was not without risk—the Trinity Masters tell me that the risk ought to be considered—and the labour cast on the remainder of the crew of the salving vessel left on board their own vessel was, of course, very considerably increased."

The services in the case at bar did not exceed 2½ days, but the value of the towing steamer was much greater than in The Janet Court and the saved value much less. The element of removing the dangerous wreck at once from the crowded waters where its condition exposed other vessels to considerable danger is an element not apparently considered, if presented, in The Janet Court. A larger allowance in a

case of this kind will be more in accordance with the majority of decisions in this country and act as an incentive to steam vessels to take derelicts in tow and bring them to port.   In The Agnes Manning (D. C.) 59 Fed. 481, 482, Judge Benedict said (482):

"The appraised value of the Manning is $27,000, and her cargo $2,000. The service was performed at an expense to the owners of the Exeter City of $850. The remarks of this court made in deciding the case of The Anna, 6 Ben. 166, Fed. Cas. No. 398, more than 20 years ago, where it is said: 'For the taking in charge and saving of a wreck so situated the reward should be such as to insure at all times the rendering of any amount of labor, the incurring of any risk, and the deviation by any vessel from any voyage, in order to supply the wreck with a crew, and make her presence safe,' may be repeated here.

The libellants are entitled to a liberal salvage compensation for the services rendered.   The only question is what would be a liberal compensation.   It is claimed on behalf of the libellants that the amount awarded should very much exceed the average amount heretofore given in cases of derelict, it being now apparent that the rewards given are not sufficient to induce vessels to incur the hazard of towing a wreck, so that commerce is impaired by the number of floating wrecks left abandoned, and the government itself has felt it its duty to send national vessels out in order to destroy these obstructions to navigation.   This consideration is not without weight in determining the amount of salvage in a case like this.   In my opinion, 50 per cent. of the value of the property saved will be a liberal reward, deducting first the sum of $850, expended by the salvors, which sum is to be first paid to them."

The same proportion of value has been allowed in a number of cases of derelicts.

Mr. Justice Story said, in The Henry Ewbank, 11 Fed. Cas. 1166, citing cases, (1170):

"I have hitherto adhered with an unshrinking confidence to the general rule of a moiety in cases of derelict."

And in The Boston, 3 Fed. Cas. 929, he said (936):

"In cases of derelict, the well known and favored rule in ordinary cases is, to allow one half as salvage."

In The Lahaina (D. C.) 19 Fed. 923, Judge Benedict said (924):

"In regard to the schooner, where an appearance has been entered for the owners, and they have been heard upon the question of the amount of salvage proper to be allowed of the proceeds of the vessel, considering, in connection with the circumstances already mentioned, the small value of the property saved, the value of the salving ship, and the fact that, had not the schooner been taken in tow, she would have been abandoned, a water logged wreck, in the track of vessels bound to New York, I am of the opinion that one-half of the net proceeds of the schooner must be allowed to the salvors for salvage."

All salvage cases are, of course, to be determined on their particular facts and no general rule can be laid down.   Here, it seems to me that the interests of commerce will be best served by an allowance of 50 per cent of the saved value, after deducting the expenses indicated above.

Three-fourths of the salvage will be divided equally between the chartered owner, the New York & Porto Rico Steamship Company, and the sub-charterers, Curran & Burton, in conformity with the charter between them, wherein it was provided:

"23. All derelicts, salvage and towage to be for Owners' and Charterers' equal benefit, after deducting expenses incident thereto, and the settlement of such claim shall be attended to by Owners."

The master and crew of the steamer should receive the remaining fourth of the salvage, which will be divided into parts, the number of parts to be increased so as to give the master three parts and the second officer and men who went on the schooner two parts each.   The division will be according to wages.   If necessary, a reference may be had to properly apportion the award to the master and crew.

Decree accordingly.