THE TOLEDO.

(District Court, S. D. New York. April 11, 1905.)

SALVAGE—SAVING BURNING OIL STEAMER—COMPENSATION.

A fire broke out in combustible material in the storeroom of a tank steamer lying at Port Arthur, Tex., and laden with crude petroleum, at about 9:30 p. m. Libelants' tug went to her assistance, and, breaking a port into the storeroom, with a hose extinguished the fire, the service requiring an hour or more. Both vessels and those on board were in some danger from a possible explosion of gas and oil. The tug was worth $20,000, and the saved value of steamer and cargo $221,000. *Held*, that the salvors were entitled to an award of $9,000, one-third to go to the officers and crew.

[Ed. Note.—Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.

Butler, Notman & Mynderse, for libellants.
Wing, Putnam & Burlingham, for claimant.

ADAMS, District Judge. This action was brought by the Fuel Oil Transit Company, the owner of the steamtug Captain Sam, and her officers and crew, and Philip R. Jones, the marine agent of

Guffey Oil Company, at Port Arthur, Texas, to recover a salvage compensation for services rendered to the steamship Toledo, and her cargo of crude petroleum, at Port Arthur, in subduing flames which broke out in her store room about 9:15 o'clock P. M. on the 27th day of February, 1903.

It appears that the Toledo was a nearly new steel steamship 256 feet long over all, built at Toledo, Ohio, especially for the carriage of oil in bulk, for which purpose she had seven tanks, all of them forward of the engine room, which was in the after part of the ship. She also had a peak tank, situated in the forward part of the ship. In addition she had an after peak tank, in the stern of the ship, commonly used for fresh water. Over the forward peak tank were sailors' quarters and above them the rooms of the 1st and 2nd mates. Aft of this part of the ship was a compartment which contained the pump room and a room for ship's stores. A space 8 by 12 feet was partitioned off from the starboard after corner of the store room by open slat work to form a paint locker. It contained 2 wooden shelves, built against the coffer dam bulkhead. The compartment was reached from the main deck, through a companion way, which had a flight of steps running forward to the first deck. Another flight led from the first deck, under the first flight, to the pump room below.

Aft of the pump and store room compartment was a coffer dam 2 feet wide, running from the upper deck to the bottom of the ship, which separated Tank No. 1 from the pump room compartment and there were 5 more tanks, running back to another coffer dam, which separated No. 6 from No. 7, the latter being used for oil or coal, as might be desired. Another coffer dam separated No. 7 from the fire room.

Port Arthur was the outlet for the Texas oil fields, as well as other products of that state. Its deep water harbor was connected by an artificial canal with Sabine Pass, 8 miles distant. The latter communicated with the Gulf of Mexico by a natural water way. The basin at Port Arthur is lined with warehouses, grain elevators, lumber wharves, owned by various parties, and the oil wharves of the J. M. Guffey Petroleum Company. There were three of the latter but only one sufficiently completed at the time to be used for loading vessels.

The Toledo had come to Port Arthur in ballast, from Philadelphia, and on the 27th of February about 3:30 o'clock P. M. she was fully loaded with oil, by means of pipe lines. She had taken on board about the equivalent of 21,000 barrels of oil, which was put in tanks Nos. 2, 3, 4, 5 and 6. As soon as she was loaded, she was moved forward and moored to some spiles about 60 feet from the canal bank to enable the steamer J. M. Guffey to take her place and the latter, some 30 or 40 feet astern of the Toledo, commenced to load by means of the same lines. The oil steamer Catania was lying about 300 feet astern of the stern of the Guffey, waiting to take the latter's place when she should be loaded. The Captain Sam, a wooden oil burning tug, 85 feet long, was lying moored on

the outside of the Guffey. The Captain Sam had been that day to Sabine Pass, returning about 8 o'clock P. M., with the libellant Jones on board and was under his orders.

About 9:15 o'clock P. M. a fire broke out in the store room of the Toledo, causing volumes of smoke to issue from the companion way and through the ventilators, leading to the pump room compartment. It subsequently appeared that the fire was in some canvas on the shelves in the paint locker. There were other articles of an inflammable nature in the store and pump room, subject to be consumed by the flames. The fire was principally caused by the burning of the canvas mentioned. How it originated was apparently not known. It caused a dense smoke, with some flames, and was dangerous on account of the nature of the cargo.

An expert on this subject was examined for the libellants in court. In addition to being a scientific man, he had considerable practical experience with oil. He said, in substance, that petroleum will only ignite by contact with flames but it is constantly evaporating, giving off a combustible gas, which when mixed with air and ignited, is apt to explode with great violence. It will ignite in a temperature of 400 or 500 degrees Fahrenheit, without contact with flames. It is heavier than air and will settle to the bottom of any receptacle, driving out the air. When the tank is full, the gas will overflow on the deck of a steamer and run along and down any orifice left open and in a case like this, it was apt to run into the compartment where the fire was, with disastrous consequences to life and property. If the fire had not been promptly overcome, such a result might have occurred here and in such event the ship would have sunk, and the ignited oil have floated to other vessels, of which there were several in the harbor, and caused their destruction, as well as the warehouses and other property in the harbor.

The testimony of this witness has not been met by that of any other expert and seems to be reliable and credible. It is proved that there is generally some seepage, or leakage, of the oil and that the gas will readily penetrate through small openings, which are usually found about the rivets and other holes of iron fittings, used to separate the compartments.

A disputed question in the case is, whether the coffer dam aft of the store room was empty or full. The libellants contend that it was empty at the time of the fire and the testimony shows that after the fire it had a rusty appearance inside. It was actually empty at 9 o'clock the next morning, but the claimant says that it had been pumped out at an earlier hour. I am rather disposed to believe that it was empty at the time of the fire. In any event, it was only three quarters full and this, according to the expert testimony, was almost equally dangerous with a completely empty tank because any oil finding its way there, would rise to the top of the water and generate gas, which would have been subject to explosion in the high temperature in the immediate vicinity of the fire. The expert further says, that the upper part of the coffer dam would become red

hot, meaning a temperature of 600 to 800 degrees. The danger of explosion existed, notwithstanding Tank No. 1 was apparently empty, by the gas flowing along the deck to the pump room companion way, and thus getting into the compartment, or by entrance through any defective rivet hole or other leaks that might have existed.

Another disputed question of fact arises out of opposing contentions with respect to securing an entrance to the pump room through the breaking of the glass port on the starboard side. It is claimed by the Toledo that her master entered a small boat, which was near the steamer, and broke the port with an oar. On the other hand, the tug claims that one of her men broke it with an axe and a 2 inch hose was immediately put in, which threw a stream on the fire and eventually subdued it. It is impossible to reconcile these diverse claims and it seems that the tug's is more entitled to credence. I accordingly adopt her view in such respect.

The length of the service is also disputed. It was probably of an hour or an hour and a half's duration, but the time is not of great importance. The effectiveness is the real matter to be determined. The fact that the salvage was quickly rendered rather tends, in a case of this kind, to enhance its value.

The tug at first passed the port leading into the store room, in order to reach the bow of the steamer for the purpose of removing her, but upon being advised there that the master did not wish the Toledo to be towed away but for assistance with fire hose, the tug circled around and went to the port and then broke in the dead light and played on the fire as stated. Some time was necessarily lost in this manœuvre, but the tug reached the fire in time to effect the result and should not be blamed for any delay incident to her first attempt.

It is claimed by the libellants that the Captain Sam was worth $30,000 and by the Toledo that $12,000 would have covered her value. It appears that she was more than 30 years old but had recently been repaired and was in good serviceable condition. It is probable that $20,000 is a conservative estimate of her value.

The Toledo was worth $200,000 and the oil on board $21,936.07. The claimant's total value at risk, therefore, was $221,936.07.

The services were brief but efficient and dangerous in some degree. The question of a proper allowance is a difficult one. The libellants claim $40,000, and the claimant urges that $750 would be ample. Of course the danger to the Toledo and her cargo is the principal matter for consideration but the risk of the salvors is a proper one to enter into an award. Where human life is involved, the value of the services is increased. Dr. Lushington said, in this connection, in The Thomas Fielden, 32 Law Journal, 61, 62:

"The first question to be ascertained is the following: was there any danger to the ship, or to the lives of the individuals concerned in the performance of the salvage services? Now, that is the first and most material question, because I hesitate not to say that, however great may be the danger to the property itself, if it is wholly unattended with risk to human life, it assumes much less value than when under circumstances where human life

is put in peril. * * * The time is of no consequence. I have even held the opinion that, when once I can come to the conviction that human life has been at stake, even for a short time, it is the duty of the Court amply to reward the persons concerned; and for obvious and plain reasons—first, because from the necessity of the case, a very great reward should be given wherever there has been a sacrifice of human life; and, secondly, that human life is above all other considerations, and ought never to be exposed to unnecessary hazard and risk."

The danger was recognized on the Toledo, many members of her crew were seeking safety in flight. The officers however remained and did what they could in the emergency. There was practically no other assistance than that of the Captain Sam to be had. The Guffey, lying astern of the Toledo could have aided her with a stream of water, if the fire could have been properly reached by the pump room companion way, but assistance of that kind was of little use as the fire could not be subdued in that way, owing to the difficulty of obtaining an entrance there on account of the smoke. The port in the locker room was apparently the only practicable way of conquering the flames with water, although something might have been done through the companion way by the use of steam, but it is doubtful if all ventilation of the compartment could have been stopped and the vessel saved in that way. The master of the Guffey testified that he had a steam hose but his appliances would have been useless in this fire.

No closely analogous case to this has been cited but several where danger existed on the salved vessels have been called to my attention, viz.: The Cyclone (D. C.) 16 Fed. 486; The Lydia (D. C.) 49 Fed. 666; The Elena G. (D. C.) 61 Fed. 519, and The Elmbank, 69 Fed. 104, 16 C. C. A. 164.

The Cyclone was a case of salvage in New York Harbor, where a bark loaded with naptha took fire while lying at a wharf. She was towed into the stream and the fire extinguished. The value of the vessel was appraised at $6,500 and that of the naptha at $7,553. It was held that the bark and cargo were in extreme danger and that there was personal hazard attending the services, owing to the inflammable and explosive character of the naptha. 15% was allowed upon the value of the vessel and 25% upon the cargo.

The Lydia was lying in the Kill von Kull at the end of the pier at Bayonne loaded with 2,900 barrels of crude petroleum and iron pipes. It was said that the petroleum cargo was highly inflammable and the gases, from it, if confined, liable to explode. The value of the ship was from $8,000 to $10,000 and of the cargo $12,-412. The aid of the tugs engaged in the service of towing into the stream and extinguishing the fire was timely and prevented any serious loss. $4,000 was allowed for the whole service.

The Elena G. was lying in the Schuylkill River at Point Breeze, loaded with 39,641 cases of refined petroleum. A fire and explosion occurred a short distance away, setting fire to the wharf where the vessel lay and to large quantities of oil floating on the river. The flames were communicated to another vessel and the Elena G. There was great danger that they would reach the cargo

and cause instant destruction of it and the vessel, worth together about $35,000. The salving tugs were worth about $53,000. A salvage of $6,800 was allowed.

The Elmbank was lying at a dock in San Francisco. Her cargo consisted of sulphur. A fire broke out which the City Fire Department was unable to subdue with water and the agent of the underwriters engaged the services of the libellant, who had previously, to the agent's knowledge, extinguished a fire in a vessel's hold by the use of carbonic acid gas. The libellant directed that the fire engines cease pumping water into the hold and that all the hatches. and other openings into the hold be tightly closed. He then provided empty barrels and fitted them with necessary tubes for the introduction of gas into the hold. Chemical engines belonging to the Fire Department were then brought to the scene. Carbonic acid gas was introduced into the hold by the engines at about 5 o'clock P. M. and by 8 o'clock P. M., or earlier, the barrels and the gas they contained, arising from the fragments of marble and muriatic acid used in them, were in use. The district court allowed $10,000 in view of the libellant's exposure to hazard and his skill as a chemist. 62 Fed. 306. The salved property was worth $97,000. The award was reduced to $6,000 on appeal.

While none of these cases affords any particular aid in the determination of the question here as to the amount of the award, yet they indicate the disposition of the courts to recognize services rendered under dangerous circumstances and so far are applicable as the testimony here shows that the tug and salvors as well as the Toledo and cargo were in a somewhat hazardous situation. Of course, the danger to the tug was not imminent at any time, except possibly from the effects of an explosion on the Toledo and what risk there was of that was quickly averted.

I think that, considering the value of the property at risk and saved, $9,000 will be a proper compensation, one third of which should go to the master and crew of the Captain Sam, in proportion to their wages, the master receiving a double portion. The libellant. Jones, as he was identified with the tug, will be considered as one of her officers and will be allowed three portions at the rate of master's wages.

Decree for libellants accordingly.