## THE EDITH L. ALLEN.

(District Court, S. D. New York. June 30, 1905.)

1. SALVAGE—AMOUNT OF COMPENSATION—SAVING WRECKED AND ALMOST DERELICT SCHOONER.

    A four-masted schooner, bound from a Florida port to New York in December, with a cargo of lumber in her hold and on her deck, when about 12 miles off Hatteras Light, in the night, struck some object which tore a large hole in her bottom, causing her to fill until her deck load was under water, and the crew were obliged to stay on the roof of the deckhouse. The schooner was anchored, and on the afternoon of the next day the large passenger and freight steamer Sabine, bound for New York, came to her rescue in response to her signals of distress. The master,

and crew, who were without food, and with their clothing wet and frozen, abandoned the schooner and went on board the steamer. After consultation the steamer sent men on board the schooner, who cut her anchor chain and made fast a towline, and, with considerable trouble and some danger to the steamer, she was safely towed to New York; the steamer being delayed two days by the service. The saved value of the schooner cargo and freight was $25,000, and the value of the Sabine $300,000. *Held*, that while the schooner was not, strictly speaking, a derelict, she might justly be considered such for salvage purposes, and that in view of such fact, and that the lives of the crew and of the master's daughter, who was on board, were in peril, and were probably saved by the Sabine, the latter was entitled to an award of $8,000, besides reimbursement for her losses and expenses.

[Ed. Note.—Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

2. Same—Elements of Award—Saving of Life.
    The saving of life forms an essential ingredient where the question of compensation for salvage services is under consideration.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, § 57.]

In Admiralty. Suit to recover for salvage services.

Butler, Notman & Mynderse, for libellants.
Avery F. Cushman, for claimant.

ADAMS, District Judge. This action was brought by The New York & Texas Steamship Company, the owner of the steamship Sabine, and the master and crew thereof, to recover salvage compensation for services rendered to the schooner Edith L. Allen, her cargo of lumber and freight, in December, 1904. The saved value of the schooner, cargo and freight was stipulated to have been $25,000 and of the Sabine $300,000. It is not denied that salvage services of considerable merit were rendered and the dispute is concerning the amount of compensation to which the libellants are entitled, they claiming that the schooner was substantially a derelict and a compensation of 50% of the saved value, together with disbursements, should be allowed. The claimant contends that the schooner was not a derelict, and that 10% of the saved value, with disbursements, will be ample.

The Allen was a large four masted schooner, 182 feet long, 39 feet beam and 21 feet depth of hold. She was bound from Fernandina, Florida, to New York, with a cargo of about 800,000 feet of lumber, stowed in her hold and on deck, the latter being about 198,000 feet in quantity. Her draft was 18 feet 6 inches. She left Fernandina on the morning of the 12th of December, fully manned with a crew of 9 men, which included the master. The latter's daughter was also on board. All went favorably until Saturday, the 17th of December, when she ran into bad weather off Hatteras, which obliged her to reef. About 8.45 o'clock P. M., when about 12 miles S. S. E. from Hatteras Light, the schooner struck some submerged object, thought to be a wreck or a rock, which so injured the bottom of the vessel that shortly afterwards she was making water rapidly and soon took in such a large quantity that it was feared when she filled entirely, she would turn over. Her master thereupon concluded to anchor. Soundings were taken and it was

found that she was in 15 fathoms of water. The anchor was cast over, signal lights were set in her rigging and her halyards cut in order to get her sails down. Her whole anchor chain, some 135 fathoms in length, ran out. She soon thereafter filled so that her upper deck was from 2 to 3 feet under water and those on board were obliged to take refuge on the roof of the deck house, where they were not, however, able to keep dry. The sea came over the deck load and frequently drenched those on board, who were soon in a truly pitiable condition. Their provisions were substantially destroyed and the only food they could get was a little bread, wet with the salt water, and some cheese. It subsequently appeared that the vessel had received a very serious wound by the ripping off of her keel, leaving an opening in her bottom of about a foot wide and 30 feet long. She was only kept afloat by her cargo. She displayed signals of distress but though several schooners and steamers were sighted none came to her relief until the Sabine appeared the next day.

The Sabine was a powerful passenger and freight steamer, 317 feet long and 2,479 tons net register. She had triple expansion engines, developing 5,500 horse power, and was running on schedule time between New York, Mobile and other South Atlantic ports. She left Mobile on a voyage to New York, via Brunswick, Georgia, at 12:30 o'clock A. M. Friday, December 16, with a full cargo of lumber, naval stores and cotton, besides carrying from 10 to 20 passengers. She was due in New York Monday, the 19th, late in the afternoon. She sighted the Allen on Sunday afternoon, the 18th, shortly after 1 o'clock. The distress signals of the Allen were observed and the steamer changed her course so as to approach within ¼ to ½ a mile. It was then seen that the schooner was lying deck to the water and that the crew were on top of the after house. One of the steamer's life boats was sent to the schooner and the persons aboard were found wet and their clothing frozen. The master of the schooner in response to an enquiry from the mate in charge of the boat said that the whole crew were going to leave and that he could not stay alone but would be obliged to leave also. The captain of the schooner had asked the crew if any one would stay aboard, but all refused, even the first mate, who said that he did not think it was safe to remain. It was said by the crew that the weather was very cold and bad, that they had nothing to eat or drink and could not stay. Thereupon the captain and crew of the Allen left her, the captain and crew in the schooner's boat and the captain's daughter in the steamer's boat. When the schooner's crew reached the steamer, some discussion took place as to what should be done. In response to the captain of the steamer, the captain of the schooner reiterated his description of her condition and upon being informed by the other that she was in the track of vessels and constituted a dangerous menace to navigation, intimated his willingness to have her destroyed by fire if the captain of the steamer thought it necessary.

The captain of the steamer did not, however, give up hope of saving the vessel and after consulting with his first officer and chief

engineer, decided to send a boat's crew to investigate her condition and ascertain whether it was practicable to cut her anchor chain and then tow her north. When those sent reached the schooner, they found water washing over her deck load and that she was 4 or 5 feet by the head. Her main deck was 2 feet or more under water and the main rigging broken on the port side. It was determined to cut the chain and try the towing. It was necessary to cut a hole through the deck to reach the place where the chain was fastened. Two hours of hard labor were required to get the vessel free from the anchor. This was effected by men from the steamer. The master of the schooner was aboard of her during the operation but apparently took no active part in it or subsequent operations. The rest of the schooner's crew remained aboard the steamer and thereafter all necessary work was done by the steamer's crew. While the chain was being cut, a new 200 fathom 10 inch manila hawser was prepared on the steamer for towing use, and when the anchor chain was cut, was run on board of the schooner and made fast around her foremast. All then went aboard the steamer and the towing began, about 5 or 6 o'clock in the evening, but owing to the schooner's bad yawing, and the consequent danger to the hawser, no success could be made of it. It was then determined to put a crew of an officer and 2 men aboard from the steamer to aid in the steering. The steering gear was intact but though she towed better she still sheered badly, and took water aboard almost constantly, causing the steering crew to get wet, so that it was thought advisable to serve liquor to them in such quantities as they wished.

About 4 o'clock Monday morning, the 19th, when they were proceeding, at the rate of about 5 or 6 knots per hour, owing to the surging and heavy strain of the schooner, the hawser parted about 15 fathoms from the stern of the steamer, carrying away the port bitts and tearing up the steamer's deck. The steamer waited till daylight, then ran the same line, shortened 35 or 40 fathoms by the break, to the schooner again and the towing proceeded. Thereafter, until in the vicinity of Sandy Hook, the weather was favorable for the venture, although the submerged schooner towed badly. Early in the morning of the 21st of December, they arrived off Sandy Hook, but there encountered a heavy head wind and notwithstanding the steamer dropped an anchor and kept her engines working ahead, the schooner dragged her 4 or 5 miles to sea. A tug then came and offered assistance, which the steamer was disposed to accept but the weather was so rough that the tug gave up the attempt. Later, about 11 o'clock, the tug President, which had been specially dispatched by the steamer's New York agents, arrived and with her assistance the schooner was safely delivered in New York about 7 o'clock. A watchman was then placed aboard to take care of the property but the vessel was taken charge of by several policemen, sent to her from New York. The steamer lost two days in the service which disarranged her schedule time for some subsequent trips.

The first point in controversy is whether or not the schooner was a derelict. The testimony shows that she was not actually abandoned when the steamer took charge of her but her condition was such that an abandonment was imminent if an opportunity were afforded for the crew to escape. She had a small boat to which they could have resorted in case of danger but it was not suitable in character or size for use except in case of absolute necessity. There was no help for the schooner excepting from such assistance as could be rendered by a powerful steamer and there seemed to be no other than the Sabine immediately at hand. The lives of her crew were in peril and the arrival of the steamer was very timely. Two other steamers, able to assist, came after the Sabine took charge but there is nothing to indicate that either of them would have undertaken the venture, which was not at all certain in its results and necessarily involved some hazard to the steamer, as ocean towing of this kind generally does, especially in connection with the breakage of towing lines, when there is a possibility of getting the steamer's end thereof in her propeller. Such a danger arose in this case but was averted by the careful handling of the steamer, which had her engine stopped until the steamer's end of the broken hawser was safely on board. While the schooner was not a derelict in the strict sense, she was apparently in a hopeless condition, except for such assistance as was rendered here. It seems to be a case in which she might justly be considered a derelict for salvage purposes.

A moiety is not always, however, allowed in derelict cases. The award necessarily depends upon the circumstances of the case under consideration. Where there is a large saved value and small risk to the salving vessel, it would be manifestly unjust to deprive the owners of half their value in the property. My recent decision in The Theta (D. C.) 135 Fed. 133, is strongly urged upon me by the libellant as a case in point but there the vessel was actually a derelict, the saved value was less than half the amount here involved and the vessel was drifting helplessly not very far from the entrance to New York Harbor. The necessity of holding out a large reward, which it seemed to me existed there, does not appear here as this vessel was not drifting and it is not by any means correct to say that she would ever be, in that sense, a menace to navigation. If she was not saved by some steamer, she would eventually doubtless have sunk where she was anchored and until then could, as long as her lights lasted, be seen by night as well as day, and avoided by vessels, of which, while she was in the track of navigation, there were not as many likely to go as where The Theta was drifting. Of course, she would as a sunken vessel have been dangerous but what would have happened in such a case is too much a matter of conjecture to be seriously considered. No doubt it was expedient to remove or destroy her and the Sabine is entitled to great credit for accomplishing the former result and bringing her to port but it does not seem to me that the same rule should be applied as in The Theta.

In arriving at an award, another matter is to be taken into consideration. If there were danger in towing the vessel, then it was proper to terminate the risk as soon as possible. That could have been done by taking her into Newport News, where she could have been taken care of. The steamer with her in tow could have reached that place some time Monday afternoon and, having left the schooner, arrived at New York the following night. She therefore would have saved considerable time as well as risk. Of course it would not have been as convenient as taking the schooner to New York, where the steamer was bound, but the question is what was best for the schooner.

On the other hand, it is to be remembered that here the lives of the crew of the schooner were probably saved, which forms an essential ingredient where the question of compensation is under consideration. The Thomas Fielden, 32 Law Journal, 61, 62; The Toledo (D. C.) 136 Fed. 959.

Having all these matters in view, it seems to me that an award of $8,000 will be proper.

The libellant, The New York & Texas Steamship Company, claims recovery of the following damages and expenses, viz.:

| | | |
|---|---:|---:|
| Hawser destroyed | $ 387 | 10 |
| Towage by tug President | 225 | 00 |
| 75 extra tons of coal consumed | 262 | 50 |
| Extra provisions for crew | 150 | 00 |
| Repairs to steamer's bitts and deck | 88 | 90 |
| | $1,113 | 50 |

The claimant objects to the allowance of $387.10 for the hawser and $225 for the services of the President.

The sum claimed for the hawser is disputed. It is contended that while it is testified for the steamship company that it still has the hawser, because it is considered that more should be obtained for it than old junk, which it could be sold for, bringing $62.90, it is actually worth more. It does not appear though how it is worth any more. The cost is shown as $450 and the present value as $62.90, leaving a deficit of $387.10, fairly attributable to the service in towing.

The towage charge is criticised because it is not shown how it was earned. The President was employed in the regular course of business and when her bill of $225 was rendered, it was paid without question because it was regarded as moderate. It seems to have been so. The tug was a large and powerful one and went outside for the purpose of assisting in bringing in the schooner into port. She was at first towed by the Sabine, with the tug acting as a rudder; finally the tug took charge of the wreck, and did all of the towing. There is nothing before me to show that the charge was in any way improper under the circumstances. I think the steamship company was justified in paying the bill and making the amount a charge in the case.

The salvage awarded above will be divided between the owner of the steamship and her crew in the proportions of 75 and 25 per cent.

The crew's share will be divided according to their wages, the master and those who went on the schooner to steer her to have double shares. The engineer who worked on the anchor chain to have one and a half shares.

Decree for the libellants accordingly.